

**DEPARTMENT OF VETERANS AFFAIRS**
**Veterans Health Administration**
**Washington DC 20420**

Ermin Kreso, MD          **MAR 1 7 2011**
165 S. Syracuse St.                                        In Reply Refer To:
Denver, CO  80230

SUBJECT: Disciplinary Appeals Board Decision

Dear Dr. Kreso:

A Disciplinary Appeals Board was convened to consider the appeal of your discharge from the VA Eastern Colorado Health Care System, Denver, Colorado.

At the time of your discharge, you were a full-time permanent employee who had completed your probationary period.  The action being appealed is a major adverse action.  The charges, upon which the action is based, in whole or in part, involve issues of professional conduct and competence, and the appeal was timely filed.  Therefore, I find the Board's jurisdictional determination was proper.

The Board sustained the charges that you failed to attend to patients presenting to the Emergency Department for treatment (3 of 5 specifications sustained); engaged in patient neglect due to delay of care to patients (1 of 2 specifications sustained); and engaged in disruptive behavior.  The Board concluded that the sustained charges were sufficient to support the penalty of a removal.  After careful consideration of all of the evidence, including the Board's analysis and findings, it is my determination to execute the decision of the Disciplinary Appeals Board.  A copy of the approved Board Action is enclosed.   This is the final administrative action in this case.

This is the final administrative action in this case.

Sincerely,

Robert Jesse, MD, PhD
Principal Deputy Under Secretary for Health

Enclosure

cc:   Ellen F. Stewart, Esq.
      Berenbaum Weinshienk PC
      370 17th Street, Suite 4800
      Denver, CO  80202

      Medical Center Director

EXHIBIT 1

| **VA** Department of Veterans Affairs | **BOARD ACTION** |
|---|---|

*INSTRUCTIONS - Prepare one copy for Field Station and one copy for Central Office for all employees for whom Board Action is forwarded to Central Office for review or filing in Board Action Folder.*

| 1. EMPLOYEE/APPLICANT'S NAME | | 1A. EMPLOYEE'S POSITION |
|---|---|---|
| Kreso, Ermin | | Physician |

| 1B. EMPLOYEE'S GRADE AND STEP | 1C. NAME OF STATION |
|---|---|
| VM-0602/02 | Denver, Colorado |

## INITIATING BOARD

| 2. NAME OF BOARD *(Check one)* | | | 3. STATION OF BOARD | 4. DATE |
|---|---|---|---|---|
| ◯ PROF. STD. BOARD   ◉ DISCIPLINARY   ◯ PHYSICAL STANDARDS | | | Denver, Colorado | |

5. FINDINGS

### I.   INTRODUCTION

By letter dated April 30, 2010, a Disciplinary Appeals Board (Board), appointed by the Deputy Under Secretary for Health for Operations and Management, to conduct a hearing on the removal of Dr. Ermin Kreso (Appellant) from the Department of Veterans Affairs Medical Center, Denver, Colorado. The Proposed Discharge letter was issued by Dr. Donald Weinshenker on November 13, 2009. Lynette Roff, Medical Center Director, signed the decision letter on March 11, 2010, sustaining the following charges: Failure to Attend to Patients Presenting to the Emergency Department for Treatment; Instructing Nurses to Send Patients Home from the Emergency Department Without Being Evaluated by a Physician; Patient Neglect – Delay of Care to Patients; and Disruptive Behavior. The effective date of the action was March 20, 2010. The Appellant appealed this action by letter dated April 5, 2010. The Disciplinary Appeals Board Hearing was convened October 13 – 15, 2010, at VA Medical Center in Denver, Colorado.

### II.   JURISDICTION

a. Employee Status: The Appellant was on a full-time permanent 38 USC 7401(1) appointment which was effective September 5, 2006.

b. Action being Appealed: Per 38 U.S.C. section 7462, a Disciplinary Appeals Boards appointed under 38 U.S.C. section 7464 shall have exclusive jurisdiction to review any case which arises out of (or which includes) a question of professional conduct or competence of a section 7401 (1) employee and in which a major adverse action was taken. Per 38 U.S.C. section 7461, a major adverse action is an adverse action, which includes any of the following: Suspension, Transfer, Reduction in grade, Reduction in basic pay, or Discharge.

**PAGE 2 – Board Action**
**DAB – Ermin Kreso, M.D.**

## III. PROCEDURAL ISSUES

A. On July 2, 2010, the appellant, through his attorney, requested an extension due to
International travel, and to facilitate preparation upon his return. Accordingly, the
appellant waived the statutory time frames (See Additional Documents, Memo dated
June 8, 2010, Ellen E. Stewart), and the Board approved the request. The hearing was
scheduled to commence October 13, 2010, at the Denver, Colorado Veterans Affairs
Medical Center.

B. The Appellant raised several procedural issues at the Pre-hearing Conference Call
and prior to the hearing: The initial issues were raised in a letter to the Agency, and a
subsequent Freedom of Information Act (FOIA) appeal to Central Office. (Agency
Evidence File: Letter: January 15, 2010) As the FOIA Appeal was not scheduled to be
heard in Central Office prior to the hearing, the Board addressed these issues.

Defendant's Procedural Issues (FOIA) Analysis:

On January 15, 2010, Dr. Kreso appealed a Regional Counsel decision to the Office of
General Counsel (OGC) regarding items he wished released under FOIA (Agency
Evidence File: Letter: January 15, 2010). The appeal had not yet been reviewed by
OGC at the time of the DAB hearing, October 13 – 15, 2010. The Board determined
that in the interim the issues, with the exception of item 2 listed below, had been
resolved.

Information Requested:

1. Complete complaint of Dr. Nancy Franzoso:

    Provided by the Agency;

2. Complete Medical records of the patients referenced in the AIB:

This was not resolved by the time of the hearing. However, Dr. Baker and Dr.
Weinshenker testified that they had not reviewed the medical record beyond what was
presented to the AIB. Neither did the Board review any other medical records;

3. and 4. The staffing lists for the ED at the time of the charges:

The Agency made good faith attempts to present as complete a record as possible.

5. The transcript of the testimony of Florence McNeal before the AIB:

**PAGE 3 – Board Action**
**DAB – Ermin Kreso, M.D.**

Ms. McNeal did not testify before the AIB (Agency Evidence File: December 10, 2009, Letter from Ms. Nelson to Dr. Kreso).

6. A copy of all policies, procedures consulted by the AIB in preparing its report, but not included in its file:

Ms. Nelson testified before the DAB that there was no other documentation referenced in preparing its report (Nelson Transcript DAB II, Page 260 Lines 17 - 21).

7. A copy of the AIB and any drafts that were not provided:

The report was provided, (albeit delayed). There were no drafts (Nelson Transcript DAB II, Page 255 Lines 9-25; Page 256 Lines 1-14).

8. A copy of any notes taken by the AIB, including a listing of questions:

Ms. Nelson testified that there was no additional AIB documentation, and that the panel, not the agency, had developed the witness list and the questions (Nelson Transcript DAB II Page 255 Line 25; Page 256 Lines 1-14).

C. The Appellant questioned the summoning and conduct of the AIB:

The Board was satisfied given the testimony of Ms. Roff: "When we do have an incident that borders on patient abuse, it is my responsibility to immediately look into it" (Roff Transcript DAB II Page 195 Line 11). (Medical Center Memo, Patient Abuse ) and Ms. Nelson: "We developed the AIB questions" (Nelson Transcript DAB II, Page 246 Line 5); "The three of us developed the witness list," and by examining the AIB time lines, that it was appropriate to summon an AIB and that it was conducted according to regulations. (Nelson Transcript DAB II, Page 259 Lines 18 - 19).

D. The Appellant's attorney filed a Motion of Censure regarding an e-mail string that occurred just prior to the hearing. (DAB File: Additional Documents: E-mail Messages, October 8 - 9, 2010):

The Board addressed this issue in some detail at its commencement. The Board agreed with the appellant that the e-mail string was a significant breach of procedure, but concluded that, following the discovery of the e-mails, the Agency had acted in good faith to correct the matter, and the Board had not been tainted against the Appellant by the inappropriate comments in the e-mails. (Transcript DAB I, Pages 17- 22).

PAGE 4 – Board Action
DAB – Ermin Kreso, M.D.

## IV. DOCUMENTS ANALYZED BY BOARD

The Board considered as evidence:

A. The Evidence File;

B. Testimony before the DAB;

C. Exhibits (attached)

## V. CREDIBILITY OF WITNESSES

The Board considered the credibility of the evidence presented before it. It had the benefit that the majority of the witnesses had given sworn testimony in two settings, the AIB and the DAB. Some witnesses appeared to have been, not inappropriately, coached by their respective counsel, prior to the DAB, and some of the patients may not have recalled all details accurately. The Board considered the testimony presented before it credible, but made the following two observations:

A. The testimony of Ms. Back seemed overly antagonistic towards Dr. Kreso;

B. Dr. Kreso's testimony before the DAB was often at odds with his testimony before the AIB and with his representation of the facts in his two written presentations to the Director in response to the proposed removal (See Agency Evidence File).

## VI. BACKGROUND

As a result of several incidents involving Dr. Kreso in the Emergency Department, most especially an incident involving his interaction with a patient presenting for lodging, the Director at the Denver VA, Ms. Roff, appointed an AIB. The findings of that AIB led to a proposal for the discharge of Dr. Kreso. After consideration, the Director decided upon discharge. Dr. Kreso is appealing that discharge before a DAB.

PAGE 5 – Board Action
DAB – Ermin Kreso, M.D.

## VII. FACTS AND ANALYSIS

Charges and Specifications:

Charge 1 - Failure to attend to patients presenting to the Emergency Department for treatment.

Specification 1:  On May 11, 2009, patient WB presented to the Emergency Department (ED) with urinary problems. This patient has a history of bladder cancer.  Susan West, RN, informed you of the care they provided to the patient.  You stated to Susan West, RN, that you did not need to see the patient and the nurse should tell the patient he should watch for fevers and continued dysuria and that he could be discharged from the ED. You failed to see the patient in the ED and assess his medical condition.

Finding:  Specification 1 is sustained.

BOARD'S SUMMARY OF EVENTS  (based upon the evidence):

Patient WB presented to the ED at 5:23 a.m. on May 11, 2009, (Triage note).  At that time on duty in the ED were RN Floris McNeal and RN Susan West.  Dr. Kreso had retired to the ED M.D. "Night Room".  WB was complaining of dysuria and difficulty with flow in his catheter.  Nurse McNeal manipulated the catheter and resolved the issue. Nurse West informed Dr. Kreso of the presence of the patient at 6:10 a.m. and of the treatment provided by Nurse McNeal.  Dr. Kreso instructed her to send the patient home.  At this time Dr. Kreso had not reviewed the Medical Record.  Some short time later Dr. Kreso left the "Night Room", reviewed the record in the computer, and entered a computer note (7:24 a.m.).  He did not examine or interact with the patient. "Reviewing the medical record had no part in the decision to send the patient home "(Kreso Transcript DAB III, Page 184 Lines 14 - 25).

FACTS IN DISPUTE:

Dr. Kreso argued that manipulating a catheter was within the scope of practice of a qualified RN, and therefore (sic. as she was a medical practitioner), that he did not need to see the patient, neither as a matter of patient safety, nor as indicated by the "spirit of EMTALA" in practice at the ED, nor as he understood the ESI triage guidelines which had been discussed at staff meetings (Kreso Testimony AIB, Page 7 Lines 1 - 3).  He also drew the distinction that he was informed the patient was there, but was not asked to see the patient.  "To my best recollection Nurse West did not request that I see the

**PAGE 6 – Board Action**
**DAB – Ermin Kreso, M.D.**

patient" (Kreso Transcript DAB III, Page10 Lines 11 -12). He backed up his argument
with an e-mail string suggesting that WB would be a level 5 triage patient, and so did
not need to be seen by an MD. Dr. Kreso denied that Dr. Weinshenker had ever told
him that he must see every patient who presents to the ER. "That conversation never
took place." (Kreso Testimony DAB, Page 90 Line 12).

ANALYSIS:

Unless they are Advanced Practitioners, RNs are not considered Licensed Independent
Practitioners (LIP) within the VA, and so would not fulfill the obligation; under EMTALA,
for a patient to receive a medical exam by a qualified medical practitioner. Discharging
the patient from the ED without being afforded a medical screening exam ran contrary
to the expectation that all patients receive a medical screening exam. Dr. Kreso stated
that he was aware that this was policy, and Dr. Baker and Dr. Weinshenker have
testified that they had informed him of this policy. "I remember very specifically sitting
down with him and Dr. Baker......you have got to see everyone who comes here"
(Weinshenker Transcript DAB II, Page 11 Line 22 - 25) in April of 2009" (Weinshenker
Transcript DAB II, Page 20 Line 17). Dr. Meyer had also discussed this with him when
he was Chief. I do remember a lot of discussions with him about the fact that it is
imperative that he see patients that were in the ER (Meyer Transcript DAB I, Page 42
Lines 23 - 25; Page 43 Lines 1 - 6). The Board also noted that although in close
proximity to the patient while looking at the computer, Dr. Kreso did not examine the
patient.

Specification 2. On May 10, 2009, patient DW from Salt Lake City presented to the ED
for completion of his lodging request. You contacted this patient and refused to
complete the lodging request or prescribe oxygen for this patient in the ED despite
being counseled previously by your supervisor, Dr. Sandra Baker, M.D., to evaluate and
treat lodging patients who present to the ED. You were aware this patient was short of
breath; he was having a hard time talking and he had trouble making the telephone call
to the oxygen company due to his respiratory distress. His physical condition was
witnessed by Police Officer Neil Weston who contacted you regarding this patient, his
shortness of breath and need for oxygen as requested by the patient and you
acknowledged seeing the patient and again refused to assist this patient. When Officer
Weston informed you that the patient needed oxygen you replied, "I know, he was just
back here. He wants lodging." Officer Weston told you, "He can't breathe. Somebody
needs to get him some oxygen." You replied, "Well we're not giving him oxygen."
Officer Weston told you, "Well what are we going to do, just let him fall out?" You
replied, "When that happens we will deal with it." Only after Officer Weston informed
you that you would be held accountable for this patient was the patient checked into the
ED and provided oxygen. Your actions needlessly endangered the safety of the patient.

Finding:  Specification 2 is sustained.

PAGE 7 – Board Action
DAB – Ermin Kreso, M.D.

BOARD'S SUMMARY OF EVENTS (based upon the evidence)

Mr. DW arrived from Salt Lake City, some 4 hours distant, at approximately 8:00 p.m.
He had clinic appointments the following day. When he presented to the AOD on duty
he was not able to go through the administrative lodging process as he had insufficient
oxygen and possibly insufficient medication for the duration of his stay.  The AOD went
back to the ER and spoke with Dr. Kreso. There are closed doors between the ER and
the ER waiting room, but it is possible that at some time during this exchange Dr. Kreso
was able to look at DW.  Dr. Kreso testified that he had to send the patient home, citing
policy (Inaccurately) (Exhibit M-16: Lodging of Patients Policy); "I am within my legal
rights to say you do not have any immediate needs." (Kreso Testimony AIB,  Page 48
Lines 23 - 25) and because he was afraid of being reprimanded by nursing staff if he
gave the patient oxygen. "I had been verbally reprimanded by the nursing staff…. for
giving people our oxygen supply" (Kreso Transcript DAB  III, Page 17 Lines 24 - 25;
Page 18 Lines 1 - 2). Dr. Kreso concluded that the patient could not be lodged and
should return to Salt Lake City. Dr. Kreso stated that he was aware that the patient had
insufficient oxygen for the return trip. "…he was about to run out, and he was not going
to make it home safely with no additional oxygen" (Kreso Testimony AIB, Page 47 Lines
20 – 22). Dr. Kreso instructed the AOD to give DW the telephone number of an oxygen
supply company. DW went to the lobby to use the public phone. While he was having
difficulty using the phone the patient was observed and then assisted by Nurse Fox.

Nurse Fox was sufficiently concerned that she called for help.  "He was gasping like he
needed some air…. He didn't have any oxygen" (Fox Testimony AIB, Page 3 Lines 5 –
10) from the nearby dispatch office. "One of the RNs was actually having a break….
And came over to the office. I was in the dispatch office." (Weston Transcript DAB I,
Page 205 Lines 16 - 21). Dispatch sent Officer Weston who immediately went with Ms
Fox to DW, and was concerned for the patient. "He couldn't breathe, you could actually
hear him wheezing" (Weston Transcript DAB I, Page 206 Lines 10 – 11) "… he brought
a little tiny bottle… and it was out obviously." (Weston Testimony AIB, Page 4 Lines 16 -
18) and Officer Dediemar who was in the basement and arrived a few minutes later. "I
was in the basement... (Dediemar Transcript DAB II, Page 283 Lines 23 - 24) it took me
two to three minutes to get there. While Nurse Fox was assisting with the phone call,
Officer Weston went to the ER to seek assistance for DW. At this time Officer Dediemar
and Nurse Fox were with DW, who had by then contacted the oxygen company.
Officer Weston went through the doors to the ER and found Dr. Kreso. "I went directly to
Dr. Kreso and say "this guys needs help" (Weston Transcript DAB I, Page 219 Lines 13
– 15). Officer Weston explained his concerns about DW's condition. Dr. Kreso refused
to see the patient, was told by Dr. Kreso - "no we are not going to see him..;" (Weston
Transcript DAB I, Page 208 Lines 24 - 25) and after a further discussion Dr. Kreso
walked away. "… a second time…. I am going to report you ..." (Weston Transcript DAB
I, Page 209 Lines 9 - 21). Dr. Kreso may have been able to visualize the patient from
the ED. Officer Weston then went to the AOD desk and after stating that he would

**PAGE 8 – Board Action**
**DAB – Ermin Kreso, M.D.**

report the incident to the Director if action was not taken "I went to the AOD ... I will tell
the director... (Weston Transcript DAB I, Page 211 Lines 8 – 16) when I got back he
was sitting in the waiting room with some oxygen." (Weston Transcript DAB I, Page 211
Lines 24 – 25), obtained hospital oxygen for DW. The AOD took care of the oxygen...It
was on two and he had to bump it up to a 3... he was taking shots of an inhaler just to
talk to me." (Weston Testimony AIB, Page 7 Lines 19 – 21).

Apparently, the night supervisor was called. "Somewhere along the line Nursing
supervisor Barrows appeared – I contacted her." (Weston Transcript DAB I, Page 218
Lines 1 – 5) and arranged for the patient to be lodged. "Officer Dediemar drove him
over" (Weston Testimony AIB, Page 10 Lines 10 – 14). Dr. Kreso did not interact with
DW directly. Later, Dr. Kreso filed a patient safety report as he wished to address
systems issues that had patients arriving inadequately prepared to be lodged.

## FACTS IN DISPUTE:

During testimony Dr. Kreso both acknowledged and denied knowing the details of the
lodging policy, which details the ER physician's role and interaction with patients
presenting for lodging, including, if necessary, completing a lodging request and
providing urgent medical care.  (CM HAS 136 Lodging of Patients:  3 b (2) (3) – See
Attachments). "There is something called a lodging protocol...; (Kreso Testimony AIB,
Page 39 Lines 3 – 4) "Yes there is a written lodging policy" (Kreso Transcript DAB III,
Page 15 Lines 3 – 5). "I was told at the beginning that according to our policy it was not
the responsibility of the ED...., and when a lodging patient's medical concerns should
be addressed." (Kreso Transcript DAB III, Page 15 Lines 11 – 15).

Dr. Kreso acknowledged that the patient should have been medically assessed.  "If the
patient who presented for lodging had an acute emergent medical condition.... That
they should be evaluated for such a condition." (Kreso Transcript DAB III, Page 15
Lines 16 – 20).  ".. any kind of shortness of breath... needs to have an immediate
medical evaluation;" (Kreso Testimony AIB, Page 58 Lines 5 – 7). "However, let's say
that person runs out of oxygen the next hour... he might become cyanotic" (Kreso
Testimony AIB, Page 49 Lines 3 – 5).

Dr. Kreso gave conflicting testimony as to whether he had communicated directly with
DW which might speak to his knowledge of the level of DW's distress. "Did you see the
patient? No, he was in the waiting area." (Kreso Testimony AIB, Page 52 Lines 11 -
14). "I told Mr. Willis." (how to get oxygen) (Kreso Transcript DAB III, Page 19 Line 25;
Page 20 Lines 1 - 4) "I saw Mr. Willis standing there ... (when talking to Officer Weston)
(Kreso Transcript DAB  III, Page 22 Lines 2 – 3).

**PAGE 9 – Board Action**
**DAB – Ermin Kreso, M.D.**

Counsel for the appellant stressed differences in the accounts of Officer Dediemar "Other than the loud talking DW did not appear to be in any distress") (Dediemar Transcript DAB II, Page 268 Lines 22 – 24) and Officer Weston – but their testimony is compatible, and they may not have been together at any time; "there was nowhere that Dediemar was with me" (Weston Transcript DAB I, Page 214 Lines 17 – 18).  Officer Dediemar being present when Officer Weston was in the ED with Dr. Kreso.

ANALYSIS:

DW arrived without the requisite paper work and medical supplies that he, as a lodger, should have brought with him.  This was not an unusual occurrence, and the patients would normally be accommodated by the ED doctor who would complete the paperwork.  There could have been no doubt that DW had severe medical problems, and was oxygen dependent.  Dr. Kreso showed a severe lack of compassion and a lack of concern for DW's medical wellbeing when he directed that the patient be sent to the phone to obtain sufficient oxygen supply to return to Salt Lake City, and miss his VA appointments the following day.   At that time DW was sufficiently in medical distress as to concern Nurse Fox, and subsequently Officer Weston.  Dr. Kreso disregarded the concerns of Officer Weston in regards to the medical distress of DW and simply walked away.  This behavior falls well below the expected standard of care of any doctor, and placed DW at significant risk.  In his testimony before the AIB and DAB he remained ambivalent over whether he should have cared for DW. (Kreso Testimony AIB, Pages 39-59): Question: "Would you do something different?"  Answer:  "Because obviously I have people who are concerned who complained" (Kreso Transcript DAB III, Page145 Lines 17 – 19).

Specification 3.  On May 10, 2009, patient PA presented to the ED complaining of bugs all over his body, larvae in his mouth and excoriations of both his upper and lower extremities and ears.  You documented in his medical record that he was suffering from "delusions of parasitosis."  You also documented that after attempts to educate the veteran that he was suffering from delusions, he did not fully believe you despite multiple attempts at reassurance.  You discharged the patient with an altered mental state without performing a mental status examination, a neurological examination, obtaining lab tests such as a Complete Blood Count (CBC), Toxicology Screen or Liver Panel, or requesting a psychiatric consult.  When the patient returned to the ED a short time later, you failed to complete the assessment on this patient.

Finding:  Specification 3 is not sustained.

**PAGE 10 – Board Action**
**DAB – Ermin Kreso, M.D.**

BOARD's SUMMARY OF Events  (based upon the evidence)

Mr. PA, who was well known in the ED, presented with a complaint of feeling and seeing bugs all over his body.  Dr. Kreso took a history and examined the patient. He made a diagnosis of Delusional Parasitosis secondary to drug abuse.  Dr. Kreso did not perform any tests, nor seek any consultations, and discharged the patient with a plan for follow up in the Mental Health clinic the following day.

ANALYSIS

Dr. Kreso's statements may reflect a bias towards a certain section of the veteran population, "PA…was he a Black gentleman?  Diagnosis PTSD, heroin abuse, cocaine abuse and marijuana abuse;  (Kreso Testimony AIB, Page 77 Lines 23 – 25) "... due to his ongoing abuse…" (Kreso Transcript DAB III, Page 30 Line 13),   and he might have considered supporting his clinical diagnosis with some laboratory testing to rule out other causes of delusion or whether there was acute intoxication.  Other physicians may have considered that the patient's active delusions would put the patient at some risk of harm, and would warrant admission.  However, Dr. Kreso's treatment of PA falls within the range of acceptable treatment.

Specification 4.  On February 28, 2009, patient CL presented to the ED with an abscess on her head.  She was complaining of increased pain and redness.  You incised the abscess.  The patient asked you for a single pain pill, you advised her to take ibuprofen. You refused to provide pain medication after conducting an invasive procedure.

Finding:  Specification 4 is not sustained.

BOARD'S SUMMARY OF EVENTS  (based upon the evidence)

Patient CL  presented to the ED on the evening of February 28, 2009, where Dr. Kreso either  performed incision and drainage of a scalp abscess, or manipulated a previously incised abscess (The full record was not reviewed but the Board did not consider it necessary in evaluating the Specification).  CL was a Mental Health patient, but did not have a history of illicit drug use.  Dr. Kreso examined the site, using local anesthetic. He discharged CL with instructions to take Ibuprofen for any further pain.  Shortly afterwards CL returned (she may or may not have physically exited the ED area) with a request for narcotic type medication for analgesia/sleep aid.  Dr. Kreso considered that she had not "checked in" and therefore her request would not be considered.  Dr. Kreso called the VA Police and had CL escorted from the ED.  "CL was denied a pain pill by Dr. Kreso, she got upset and the police were called" (Back Transcript DAB I, Page 197 Lines 10 – 17).  He subsequently filed an incident report regarding how CL was able to re-enter the ED.

**PAGE 11 – Board Action**
**DAB – Ermin Kreso, M.D.**

### FACTS IN DISPUTE:

Dr. Kreso's testimony regarding his reasoning for not considering CL's request upon her return was different at the AIB ".. CL basically invaded the premises due to a faulty security perimeter", (Kreso Testimony AIB, Page 76 Lines 23 -- 24) from that given before the DAB. "... could cause a medication-medication interaction.." (Kreso Transcript DAB III, Page 40 Line 11).

### ANALYSIS

The use of narcotics, and deciding when they are needed, is always a difficult issue for ED physicians, and individual physicians have different outlooks on when their usage is appropriate. However, a physician should feel a responsibility to address a patient's complaint of pain, whether that is by education, physical means, or medication – narcotic or non-narcotic. Testimony suggested that Dr. Kreso was not in favor of narcotic use. "I have seen him dig his heels in when people asked for narcotics" (McNamara Testimony AIB, Page 4 Lines 1- 2). In this instance he might have considered re-evaluating CL upon her return, as opposed to being concerned about how CL had re-entered the ED, ".. CL basically invaded the premises due to a faulty security perimeter (Kreso Testimony AIB, Page 76 Lines 23 - 24) but his management of the patient's complaint of continued pain did not reach the standard of being unacceptable.

Specification 5. Patient IS presented to the ED at 3:00 a.m. on April 29, 2009 with a complaint of inability to sleep due to coughing, congestion and sore throat. The patient is a Registered Nurse and complained that you did not address his Pulse Oximetry of 92 and that you only listened to the two upper lobes of his lungs. The patient states that you told him that there was nothing wrong with him, this was not a true emergency, and that you told him to tell his wife not to bring him to the ED unless it is a true emergency.

Finding: Specification 5 is sustained.

### BOARD'S SUMMARY OF EVENTS (based upon the evidence)

Patient IS presented to the ED at 3:17 a.m. on April 29, 2009, with a complaint of inability to sleep due to coughing, congestion and sore throat. The patient had been symptomatic for a few days and came as his wife was concerned that his condition was not improving, and because he was worried about possible cardiac symptoms. Dr. Kreso examined the patient, and discharged him with a diagnosis of "likely chronic

**PAGE 12 – Board Action**
**DAB – Ermin Kreso, M.D.**

sinusitis with post nasal drip in the setting of obesity/weight gain. "and informed the patient that he considered Mr. IS to have visited the ED inappropriately . (Kreso: ER Note: "Patient education at discharge: do not utilize the ER resources for issues such as this in the future"). The patient was sufficiently upset by his interaction with Dr. Kreso that he went to the Patient Advocate the next day and filed a complaint.

## FACTS IN DISPUTE:

There was differing evidence regarding whether IS had stated to the triage nurse that he had chest pain, which would have been a more serious complaint. "I recall telling the nurse I had chest pains;" (IS Testimony DAB I, Page 307 Line 17 – 19)  Question: "..did he indicate… that he had chest pain?" Answer :  "No, Never." (Kreso Transcript DAB III, Page 47 Lines 14 – 16). There was also a discrepancy in the testimony regarding the extent of Dr. Kreso's examination of IS. "He didn't examine my chest, just my upper back." (IS Transcript DAB I, Page 319 Lines 13 – 14).   "… I performed a pulmonary examination…" (Kreso Transcript DAB III, Page 48 Line 17).  The Board concluded that there were some errors in IS's recollection of details, but the Board found the majority of IS's story credible.

## ANALYSIS:

IS presentation to the ED was legitimate and represented concern that his medical condition was not improving.  It is probable that IS did not emphasize chest pains to the triage nurse and that IS is inaccurately recalling that detail.  There is also some dispute over the extent of the physical examination provided by Dr. Kreso, although Dr. Kreso's opinion at the time, as revealed by his documentation, gives grounds for concern over its thoroughness.  There is no doubt that IS was dissatisfied with the encounter, both as to how it reassured him concerning his medical condition, "…was really brief… told me I was abusing the system..told me to tell my wife not to bring me back here", (IS Transcript DAB I, Page 300 Lines 15 – 21) and in his personal interaction with Dr Kreso. "I just felt kind of embarrassed and upset." (IS Transcript DAB I, Page 303 Lines 7 – 8). Dr. Kreso acknowledged that IS was upset  "Mr. S felt that whatever care he experienced in the ED was not acceptable to him, and he was concerned for other veterans" (Kreso Transcript DAB  III, Page 119 Lines 10  - 18).

### Finding as to the Charge 1:  SUSTAINED IN PART .

Charge 2 – Instructing Nurses to send patients home from the Emergency Department without being evaluated by Physician.

**PAGE 13 – Board Action**
**DAB – Ermin Kreso, M.D.**

Specification.  As evidenced by sworn testimony during the Administrative Investigative Board (AIB), Susan West, RN, Sylvia Murray, RN and Fay Salas, RN, Staff RN's in the ED testified that you routinely instructed ED Nurses to send patients home without being assessed or treated if you believed they did not have a true emergency. The RNs testified that patients left the ED very angry about not being treated. Some RNs testified that they refused to send patients home and had to insist that you see the patients.

Finding: Not Sustained.

### BOARD'S SUMMARY OF EVENTS (based upon the evidence

Dr. Kreso testified that there were times when he went out to the waiting area and examined patients in the nursing triage ante room prior to discharging them.   " ... it is not routine that I am the one who triages...I have been known to go out into the triage area..;" (Kreso Testimony AIB, Page 9 Lines 16 - 19)   "At times I performed the triage in the ED waiting room" (Kreso Transcript DAB III, Page 155 Line 21) . It is probable that Dr. Kreso asked nurses to send patients home if their clinical complaint was of low acuity.  "I have said that I do not need to see this patient; " (Kreso Testimony AIB, Page 30 Line 17) .  "Can you just go out and tell him that he'll have to come back on the next shift." (Murray Testimony AIB, Page 3 Lines 12 – 14). The Board could not determine with certainty during which time period this may have occurred, or elicit testimony regarding a specific instance.

### ANALYSIS:

The Board concluded that the evidence relating to this charge was either hearsay,.. "Fay Salas complained to me... no direct knowledge; " (Baker Transcript DAB I, Page 85 Line 9).  "I did not see it myself" (Salas Transcript DAB I, Page 159 Line 4) or was not specific enough to be considered absolute. "I have seen patients being sent home from the waiting room without being seen." (Back Transcript DAB I, Page 166 Lines 24 – 25).  "I don't remember details." (Back Transcript DAB I, Page 191 Line 21). There was also conflicting testimony.  ".. he has refused to see a patient (West Testimony AIB, Page 4 Line 24).....someone with a sore throat... tell him to come back in the morning... before we changed our policy and started bringing everyone back to the ER;"  "I have never seen Dr. Kreso turn away a patient." (McNamara Transcript DAB II, Page 296 Line 18). The Board concluded that the evidence was not of sufficient vigor that the Board could sustain the charge.

**Finding as to the Charge 2:  NOT SUSTAINED IN WHOLE OR IN PART**

**Charge 3 – Patient Neglect – Delay of Care to Patients**

**PAGE 14 – Board Action**
**DAB – Ermin Kreso, M.D.**

Specification 1. On May 7, 2009, GS, a quadriplegic patient presented to the Emergency Department with fever, change in breathing, thick sputum, and difficulty suctioning his tracheostomy. You downgraded his Triage Level from a 3 to a 4 and because of this change this patient *waited two and one half hours (2.5)* to be seen by a provider.

Finding: Specification 1 is sustained.

## BOARD'S SUMMARY OF EVENTS (based upon the evidence)

Mr. GS presented to the ED at approximately 16:08 on May 7, 2009. Dr. Kreso changed the triage level from a 3 to a 4, which meant that GS would be seen by the Nurse Practitioner and not in the ED by the MD. As a consequence of this change in triage GS waited four hours before being seen by NP Patricia Hughes, (ER note timed 22.09 – Agency Evidence File). This was supported by the timeline and the testimony of RN Back. "I was in the ED during Mr. S;" (Back Transcript DAB I, Page 189 Line 11).

## FACTS IN DISPUTE:

In this case, as in the following case, Dr. Kreso argued that as his shift was almost over when the patients presented he would not have changed the triage level. "I do not now believe I changed the triage level on Mr. S." (Kreso Transcript DAB III, Page 58 Lines 17 – 19). This is contradicted by credible testimony, "Mr. S.... sticks in my mind because he came in at 5:00 (Murray Testimony AIB, Page 5 Lines 18 – 21) changed him to a 4 before he left..... he didn't leave the ER until 11.00 ..... and Kreso had left..;" "'... he puts a big 4 on there and crosses out my 3..." (Murray Testimony AIB, Page 12 Line 7)  and by Dr. Kreso himself. ".. I changed the triage level from a 3 to a 4 (Evidence File: Kreso Memo, November 27, 2009, to Director) ..... It is unfortunate that the patient came in on a change of my shift and therefore had to wait for non-emergent care."

## ANALYSIS

There could have been no doubt that GS needed to visit the ED. "We came because the doctor always told me when he has a fever you have to bring him to the emergency room" (MS Transcript DAB I, Page 326 Line 24 – 24; Page 327 Line 1), and that as a quadraplegic, with a tracheostomy and known recurrent Urinary Tract Infections he should not have had his triage level downgraded. "A humane triage level would be a two." (Hughes Transcript DAB II, Page 339 Line 5). Most physicians would consider that GS was placed at some risk due to the delay in his being seen. "When everybody was gone after many hours it was he and me waiting." (MS Transcript DAB I, Page 327 Lines 7 - 8).

**PAGE 15 – Board Action**
**DAB – Ermin Kreso, M.D.**

Specification 2.  On May 7, 2009, patient DS, presented to the Emergency Department with a fever and sore throat, complaining that he thought his Tonsillitis was back again. You downgraded his Triage Level from a 3 to a 4 and because of this change the patient was made to *wait three (3) hours* to be seen by a provider.

Finding:  Specification 2 is not sustained.

BOARD'S SUMMARY OF EVENTS (based upon the evidence)

Mr. DS presented to the ED at approximately 4:50 pm on May 7, 2009, the triage note was timed at 4:55 p.m.  It is likely that Dr. Kreso changed his triage level from a 3 to a 4. ".. based upon my assessment of the triage notes, I changed the level from a 3 to a 4" (Evidence File: Kreso Memo, November 27, 2009, to Director) However, the main reason for the delay in the care to DS was that, due to a concern about him being contagious with H1N1 flu, he was placed in an isolation room and inadvertently overlooked. ".. he did the same thing to him  .. I put him in isolation and just left him in there" (Murray Testimony AIB, Page 7 Lines 2 – 4); "When I was called back I was put into a closed off room" (DS Transcript DAB I, Page 283 Lines 14 – 15); "I found DS in the waiting room or in the ER" (Back Transcript DAB I, Page 176 Lines 23 – 24).  Dr. Kreso probably had no interaction with DS. "I don't recognize him at all." (DS Transcript DAB I, Page 294 Line 11).   He was eventually discharged at 23:35.

FACTS IN DISPUTE:

Dr. Kreso stated that he did not change the triage level. "I do not recall changing the triage level on DS." (Kreso Transcript DAB III, Page 61 Line 11 – 13); Ms. Back stated that Dr. Kreso placed DS in isolation.   "DS was taken there by Dr. Kreso." (Back Transcript DAB I, Page 194 Line 3).

ANALYSIS

The testimony of RN Murray and Dr. Kreso's own admission in his written responses to the Director support that he changed the triage level.  However, the delay was most directly related to an oversight where, due to a concern regarding the spread of H1N1 influenza, DS was placed in an isolation room and overlooked for a period of time.

**Finding as to the Charge 3:  SUSTAINED IN PART**

**PAGE 16 – Board Action**
**DAB – Ermin Kreso, M.D.**

#### Charge 6 – Disruptive Behavior:

Specification.   On May 22, 2009, you verbally confronted the Lead Compensation and Pension (C&P) Program Support Assistant, Judy Cooley, in the hallway of Bldg 24, in front of Room 47.  You were physically blocking her path down the hallway and when she stated she couldn't help you, you stated, "Yes you will", and continued to tell her in a commanding voice what she needed to do for you.  You were speaking to her in an aggressive manner, insisting that she help you, even though she informed you that you needed to speak to Dr. D'Arcy or Dr. Weinshenker, your supervisors, about the scheduling of C&P appointments.  She told you that, per Dr. Weinshenker's orders she would have to call Dr. Weinshenker in order to include him in the conversation.  You then told her it was not necessary to call Dr. Weinshenker.  When she walked away from you, you followed her into her office on the same floor, Room 48, attempting to interfere with her calling Dr. Weinshenker.

Finding:  Specification is sustained.

#### BOARD'S SUMMARY OF EVENTS (based upon the evidence)

Dr. Kreso was detailed to C&P on May 20, 2009, while the AIB and its conclusions were being processed.  Ms. Cooley was in charge of the scheduling.  Dr. Kreso had, on several occasions, requested that his schedule of patients be altered. "He wanted me to schedule the patients closer together." (Cooley Transcript DAB I, Page 236 Line 20 – 21); "He might have approached me two or three times asking to change his schedule;" (Cooley Transcript DAB I, Page 237 Lines 5 – 6); "He would even sometimes call the patients and have them come in early." (Cooley Transcript DAB I, Page 254 Lines 6 – 7).  As a result of discussing Dr. Kreso's request with her supervisor, Dr. D'Arcy, she was instructed not to alter the schedule and to refer further requests to her supervisor.  Dr. Kreso initiated a conversation about this on the morning (9:30 a.m.) of October 22, 2009, and then later, at approximately 3:30 p.m. that afternoon. "That particular day there were two contacts with him." (Cooley Transcript DAB I, Page 238 Lines 2 – 3).  Dr. Kreso approached Ms. Cooley with a request to discuss patient scheduling.  Ms. Cooley stated that she was unable to discuss the issue. "I was given direction by both of them not to speak to him about his scheduling without one of them present." (Cooley Transcript DAB I, Page 238 Lines 15 – 17).   Dr. Kreso was upset and the incident evolved, essentially as reported; "Every time I would step to the left he would step to the left." (Cooley Transcript DAB I, Page 244 Lines 7 – 8) ... "He was intentionally blocking my path." Ms. Cooley felt uncomfortable and threatened by Dr. Kreso's behavior. "The way he was carrying his body in a fast, aggressive type of walk." (Cooley Transcript DAB I, Page 260 Lines 18 – 20).  Dr. Franzoza witnessed the incident and the following day was asked to write an incident report.

**PAGE 17 – Board Action**
**DAB – Ermin Kreso, M.D.**

FACTS IN DISPUTE
There were no significant differences in the facts as presented by the Agency and the Appellant.

ANALYSIS

Dr. Kreso's reasons for wishing the schedule changed were personal. "... my concern was that I was made to look bad .... That I was providing untimely care." (Kreso Transcript DAB III, Page 66 Lines 3 – 6). His account of the interaction is in agreement with Ms. Cooley and Dr. Franzoza; "My voice was raised a little bit..... I was upset." (Kreso Transcript DAB III, Page 68 Lines 11 – 15; "probably got into her personal space;" (Kreso Transcript DAB III, Page 70 Lines 12 – 14); " I think her perception may be accurate;" (Kreso Transcript DAB III, Page124 Lines 13 – 16); ".. it was kind of a tense discussion." (Franzoza Transcript DAB I, Page 267 Line 15); "She just wanted to stop the conversation;" (Franzoza Transcript DAB I, Page 269 Lines 22 – 23); "Aggressive means pursuing." (Franzoza Transcript DAB I, Page 272 Line 5); The interaction was of moderate, not severe concern to Dr. Franzano. "Not so aggressive that I felt I had to intervene." (Franzoza Transcript DAB I, Page 277 Lines 3 – 6). The incident report was filed at the request of Dr. Kreso's and Ms. Cooley's supervisor. I would probably not have written a report if not prompted to by my supervisor." (Franzoza Transcript DAB I Page 279 Lines 11 – 14).

**Finding as to the Charge 6: SUSTAINED IN WHOLE**

**VIII. PENALTY DETERMINATION**

ANALYSIS – BOARD
FACTORS CONSIDERED

The Board considered these other factors:

During testimony there were many statements by supervisors that the ED was running based on the full implementation of the Emergency Severity Index (ESI), and that the EMTALA regulations and philosophy were to be applied to patients who presented to the ED. The Board was troubled that through three supervisors of the ED (Dr. Meyers, Dr. Baker, and Dr. Weinshenker) no written policies or guidance had been generated. "I doubt there were written policies" (Meyer Transcript DAB I, Page 65 Lines 8 – 11); "..regarding triage there is nothing authored by me or Dr. Weinshenker or the hospital.."

**PAGE 18 – Board Action**
**DAB – Ermin Kreso, M.D.**

(Baker Transcript DAB I, Page 136 Line 10 – 11); "I am not sure exactly how the emergency room is trained in this" (Weinshenker Transcript DAB II, Page 18 Line 4 – 5); "I don't believe there was a specific policy or communication regarding EMTALA"; "I am concerned that you did not find any written policy regarding triage" (Roff Transcript DAB II, Page 216 Lines 9 – 14).

There was no dissemination from the Director's office, through Center Memoranda, of VHA policy regarding the functioning of VA EDs.  "We should have a Center Memorandum regarding the implementation of EMTALA at our VA" (Roff Transcript DAB II, Page 216 Lines 18 – 22).  Nor did it appear that those CM that did exist (e.g. CM HAS 136-20 Lodging of Patients) were formally brought to the attention of the ED staff.  The Agency presented as evidence some educational documentation, consisting of a photocopied chapter of a nursing manual, which was made available and distributed to nursing staff, regarding the ESI triage mechanism.  (Exhibit M3).

However, the Board decided that through discussions among the staff and directions from supervisors that the above had become the expectation in the Department.  This was supported by Dr. Kreso's own testimony.  The triage levels have an Emergency Severity Index, and our staff has gone through training, both nurses and physicians." (Kreso Testimony AIB, Page 7 Lines 1 – 3). There is something called a lodging protocol (Kreso Testimony AIB, Page 39 Lines 3 – 4). "..we were all talking about EMTALA" (Kreso Transcript DAB III, Page 152 Lines 5 – 9).

Each of Dr. Kreso's supervisors failed to begin a formal, progressive disciplinary course of action that might have altered Dr. Kreso's behavior.  "I did not consider my discussions with Dr. Kreso formal counseling." (Meyer Transcript DAB I, Page 65 Lines 17 – 19); "Not written, but we have spoken about that" (Baker Transcript DAB I, Page 141 Lines 21 – 22); "No formal disciplinary action was ever taken" (Weinshenker Transcript DAB II, Page 110 Lines 12 – 14); "I would say that those individuals have missed some steps along the way" (Roff Transcript DAB II, Page 222 Line 1).

Over a prolonged period Dr. Kreso did have discussions regarding his behavior with each of his supervisors. "I met with him more frequently ..."(Meyer Transcript DAB I, Page 35 Lines 9 – 10); Regarding retriaging, seeing all patients, failure to attend.."Yes,.. I had spoken to him personally (Baker Transcript DAB I, Page 76 Lines 14 – 22) .... Prior to May 2009;" "I couldn't have been any clearer," "Dr. Kreso, the patients show up at the emergency room, see the patients." (Weinshenker Transcript DAB II, Page 26 Lines 22 - 24); "These incidents took place after the conversation Dr. Baker and I had

**PAGE 19 – Board Action**
**DAB – Ermin Kreso, M.D.**

with Dr. Kreso." (Weinshenker Transcript DAB II, Page 25 Lines 18 - 22).   The Board
did not find Dr. Kreso's denial that these discussions took place credible.  "Dr. Baker or
Dr. Weinshenker did not counsel me regarding changing triage levels" (Kreso Transcript
DAB III, Page 77 Lines 16 – 22);  " That conversation did not take place."(Kreso
Transcript DAB III, Page 90 Line 12).

Dr. Kreso's supervisors did not consider alternate approaches to altering his behavior
as outlined in the Medical Staff By-Laws.

Dr. Kreso was capable of providing quality medical care. "I think he is a technically
competent excellent physician." (Meyer Transcript DAB I, Page 47 Lines 6 – 7); "I think
Ermin was a good physician." (Salas Transcript DAB I, Page 158 Line 17);  ".. the ones
he sees he works up pretty good..." (Murray Testimony AIB, Page 21 Lines 16 – 17).
Yet the tone of Dr. Kreso's testimony at both the AIB and the DAB, and the nature of
some of his responses, both suggest a certain lack of compassion towards the veterans
presenting to the ED.  "PA ..was he a Black gentleman?  Diagnosis PTSD, heroin
abuse, cocaine abuse and marijuana abuse?" (Kreso Testimony AIB, Page 77 Lines 23
– 25);  .."I am within my legal rights to say you do not have any immediate needs."
(Kreso Testimony AIB, Page 48 Lines 23 – 25);  "... I would also elaborate that 50% or
so of our veterans have one kind or another of psychosocial dysfunction.  (Kreso
Testimony AIB, Page 62 Lines 7 – 10).

Ms. Roff testified that Dr. Kreso's behavior was detrimental to the organization. "As the
leader of the organization I could not tolerate Dr. Kreso's behavior in the ED." (Roff
Testimony DAB II, Page 219 Lines 23 – 25).

The Board acknowledges Dr. Kreso's letter of apology to Ms. Cooley, the absence of
prior disciplinary action, Dr. Kreso's 5 years employment, and his reliability in appearing
for work.

After final analysis the Board concluded that:

Dr. Kreso was fully aware of the expectations of his supervisors, yet persisted in not
following their directions.

Dr. Kreso persisted in this behavior over a prolonged period of time and is unlikely to
significantly alter his approach to caring for veterans in the ED.

Dr. Kreso's care was detrimental to the care given to the veterans, and was damaging
to the public perception of the VA and its mission. In two of the cases presented (DW
and GS) Dr. Kreso's actions placed the patient at significant risk.

**PAGE 20 – Board Action**
**DAB – Ermin Kreso, M.D.**

## IX. RECOMMENDED DECISION

The Board acknowledges that the penalty should be based upon the combined weight of the sustained charges. Further, the Board is aware of regulatory guidelines contained in VHA Handbook 5021, Part II, Chapter I, 7 (2) that cites examples of reasons that may warrant considering a more severe disciplinary action. These reasons are (a) the facts of the case, (b) degree of willfulness of the employee's violation of VA conduct rules, (c) the seriousness of the misconduct or deficiency incompetence, and (d) the resultant impact on VA operations.

The Board examined the decision making process and analysis, including the Douglas Factor Analysis, performed by Ms. Roff and concluded that she had reached her conclusion in an appropriate fashion. 'Douglas Factor Analysis' (Roff Testimony DAB II, Pages 175-181).

The Board agrees that the agency should expect an employee to be compliant with its procedures, and to follow the direction of supervisors to support the high quality of care provided to its patients. The Appellant demonstrated a pattern of behavior exemplifying disregard for established written or verbal procedures which, though they were not always presented in writing, he had testified that he was very familiar with them. The Appellant lacked recognition of the seriousness of his actions and demonstrated a lack of sensitivity to the need for ED procedures.

### DECISION:

Charge 1. Failure to attend to patients presenting to the Emergency Department for treatment: **SUSTAINED IN PART (3 of 5 specifications sustained)**

Charge 2. Instructing Nurses to send patients home from the Emergency Department without being evaluated by Physician: **NOT SUSTAINED**

Charge 3. Patient Neglect – Delay of Care to Patients: **SUSTAINED IN PART (1 of 2 specifications sustained)**

Charge 6. Disruptive Behavior: **SUSTAINED IN WHOLE**

The Agency's action of Removal (Discharge) is sustained based on the preponderance of the evidence. The Board concludes that the Deciding Official's (Director: Ms. Roff), in light of the sustained charges and her analysis of the Douglas Factors, decision to impose the penalty of discharge is appropriate and within the range of reasonableness.

**PAGE 21 -- Board Action**
**DAB -- Ermin Kreso, M.D.**

## X. OTHER BOARD CONSIDERATIONS

The Board had prolonged discussions regarding its decisions. Not all of these discussions concluded with a unanimous decision. In deference to the seriousness of the sustained penalty the Chairperson asked the other Board participants to submit a summary analysis of their individual deliberations. These are included in Appendix I.

## XI. BOARD REVIEW OF CHARGES

The Board reviewed the sustained charges to determine which involved some component of substandard care, professional incompetence or professional misconduct.

The Board has concluded the sustained charge(s), or partially sustained charge(s), identified below involve a component of substandard care.

Charge 1: Specification 2

Charge 3: Specification 1

**PAGE 22 – Board Action**
**DAB – Ermin Kreso, M.D.**

<u>**APPENDIX  I**</u>

<u>Minority Opinion – Dr Sabharwal: Member</u>

Here is my written report. If possible please forward my minority concerns with the DAB report.

I feel this case has been particularly challenging to me.  Various testimonies of hearsay and more hearsay, the charges that seem to be collected in haste and most importantly lack of documented progressive discipline, lack of referral for counseling or professional help have been particularly noticeable  (Roff Transcript DAB II, Page 221 Lines 20 - 25).

Penalty phase:

**Charge 1. Failure to attend to patients presenting to the emergency department for treatment**
**Partially sustained**

**Charge 3.  Patient neglect -Delay of care to patients**
**Partially sustained**

For above charges nature of offense thought to be most relevant was 12 in Title 38 Table of Penalties.
Mitigating factors - No prior disciplinary action by Veterans Administration, No actual harm to patients or VA reputation or public image, lack of documented progressive discipline   or counseling .No evidence of intentional wrongdoing. Excessive duty hours (70 hours in a week) contributing to job related stress.  No defined Emergency room /triage policy, lack of clarity of instructions and supervision.

Charge 6. Disruptive behavior
Sustained

Nature of offense #16 in the Title 38 Table of Penalties.
Mitigating factor - Written apology

Review of Douglas factors of relevance was done for appropriateness of penalty. Table 38 Table of Penalties reviewed.
Two of the board members believed that the penalty of discharge was an extreme/ harsh choice.
 Even though I believe that the option of discharge was open to the Director, I disagree with the penalty of discharge by the Director.

**PAGE 23 – Board Action**
**DAB – Ermin Kreso, M.D.**

#### Charge Analysis

After careful review of various documents provided to me throughout the DAB process, following is my minority opinion of charges not sustained unanimously.

Charge 1- Failure to attend patients presenting to the emergency department for treatment
Specification 2, Not sustained

After careful review of the evidence it is my opinion that above charge was not supported by preponderance of evidence.
The veteran presented to emergency room for lodging and not for treatment. There was not sufficient evidence that the patient was in respiratory distress requiring medical services of a provider and no evidence that patient checked into the emergency room. (Dediemar Transcript DAB II, Page 265 Lines 9 – 14; Page 266 Lines 2 – 10; Page 267 Lines 13 – 17; Page 268 Lines 3 – 7; Page 276 Line 23) testimony contradicted Officer Weston's testimony (Testimony AIB, Page 6 Lines 14 - 19 by the AOD, Page 7 Lines 10 -12) (Weston Transcript DAB I, Page 206 Lines 7 - 12, Page 215 Lines 13 – 14).
Yeah -more than one, actually two cops (Fox Testimony AIB, Page 5 Lines 1- 2);
Above testimonies contradicts two officers opinion and this may have resulted from varied level of experience and perception.

Review of the evidence gives me suggestion that at no point was Dr. Kreso under the impression that the patient needed emergency treatment and if he had realized that was the case the care would have been provided. Once the patient received oxygen he was driven to lodging by Officer Dediemar; (Weston Testimony AIB, Page 10 Lines 10 – 14). Did that patient at that time have a medical complaint? No. (Kreso Testimony AIB, Page 41 Lines 17 – 22). I facilitated getting oxygen supply (Kreso Testimony AIB, Page 41 Lines 15 – 16). ----, medical clearance for lodging is really an administrative role (Kreso Testimony AIB, Page 45 Line 25) and I said -is he short of breath? No. (Kreso Testimony AIB, Page 53 Line 12 – 13); I will affirm to this (Kreso Testimony AIB, Page 58 Lines 3 – 4) purpose of safety note (Kreso Testimony AIB, Page 59 Lines 13 – 21). (Kreso Transcript DAB III, Page 18 Lines 22 - 25, Page 19 Lines 14 - 25, Page 26 Lines 2 – 7). ...with regard to this patient had I been aware the patient was in acute respiratory distress, I would have taken all actions---(Roff Transcript DAB II, Page 167 Lines 18 – 21).

Specification 5-The charge 1 of failure to attend ----- written as such is not sustained in my opinion.

**PAGE 24 -- Board Action**
**DAB -- Ermin Kreso, M.D.**

The patient was attended and given treatment is evident.
-when somebody comes in with chest pain (IS Transcript DAB I, Page 301 Line 5); did
you--(IS Transcript DAB I, Page 307 Line 17 -- 21), well what I had noticed was that it
was approximately 88 percent (IS Transcript DAB I, Page 308 Lines 23 - 24) not
supported by written documentation in medical records, Exhibit G-6 , the medical record
of the patient (triaged at level 4,no mention of chest pain in nurse West's triage note and
pulse ox of 92 percent ,no documented chest pain, documentation of medical exam
including lung exam, statement that patient dozing off in the bed)   -well what I had
noticed was that it was approximately 88 percent  (IS Transcript DAB I, Page 308 Lines
23 - 24).

Multiple factors possibly related to incomplete recall of events, medical conditions/other
factors including medications in this patient raise the question of credibility of this
patient's testimony.  It is clear that the patient was not satisfied with care, be it related to
expectations or perception/other factors but the evidence supports the patient was
attended and given treatment and hence the charge of failure to attend-for treatment not
sustained.

Multiple testimonies during the hearing process have stated that Dr Kreso is a very
good doctor including Dr. Meyer (appellant's former supervisor) "I think that is fair, he is
technically competent, excellent physician" (Meyer Transcript DAB I, Page 47 Lines 6 --
10).  I have no reason to believe that if patient had chest pain he would have been
triaged at level 4 or Dr. Kreso would not have worked up chest pain had it been patient's
complaint at the time of presentation.

**Charge 6-Disruptive Behavior**
**Not sustained**

The incident related to this charge was witnessed by Dr Franzoso.
 - conscious decision that it was ok to leave the area then, (Franzoso Transcript DAB I,
Page 277 Lines 3 - 6, Page 272 Lines 5 - 8, Page 269 Lines 7 -- 8) all provide evidence
of confrontation that was felt to be by Dr. Franzoso of the intensity that it didn't require
intervention (Franzoso Transcript DAB I, Lines 22 - 23, Page 267 Line 15). Dr Franzoso
who was asked to write the report by supervisor next day and would probably not have
written the report (Franzoso Transcript DAB I, Page 279 Line 11 - 14).
The available evidence suggests to me that the behavior though inappropriate and
confrontational did not rise to the level of disruptive behavior.
Cultural differences, previous experiences /background and probably personality issues
may also be contributing factors.  A written apology (done) and possibly counseling
/nondisciplinary action may have been more appropriate for this charge.

## BOARD ACTION

| 6. AFTER CAREFUL CONSIDERATION OF ALL FACTORS, THE BOARD RECOMMENDS THAT THE EMPLOYEE BE *(Check one and explain in detail in Item 9.)* | 7. RECOMMENDED GRADE AND STEP |
|---|---|

| ○ APPOINTED | ○ PROMOTED | ○ GIVEN SPECIAL ADVANCEMENT | |
| ○ NOT APPOINTED | ○ DECLARED INELIGIBLE | ● OTHER (Specify) | 8. PHYSICAL EXAMINATION |
| | ○ NOT PROMOTED | Disciplinary Appeals Board (DAB) | ○ APPROVED   ○ NOT APPROVED |

**9. OTHER RECOMMENDATIONS AND ADDITIONAL REMARKS TO SUPPORT RECOMMENDATIONS IN ITEM 6.**

```
Charge  1.  Sustained in part
Charge  2.  Not sustained
Charge  3.  Sustained in part
Charge  6.  Sustained in whole
```

The Agency's action of Removal (Discharge) is sustained based on the preponderance of the evidence.  The Board concludes that the penalty of Removal (Discharge) is appropriate and within the range of reasonableness given the severity of the misconduct and impact upon the patients.

**10. SIGNATURE(S) OF INITIATING BOARD MEMBERS** *(All signatures must be dated)*

| A. CHAIRMAN | B. MEMBER |
|---|---|
| Ciaran M. O'Hare 184693 | SHAKTI SABHARWAL |

| C. MEMBER | D. MEMBER | E. SECRETARY |
|---|---|---|
| | | Dawn R Howell |

| 11. Certification of initiating board technical advisor that board action is complete and has been reviewed for adherence to all legal and technical requirements before being forwarded to approving authority. | SIGNATURE | DATE |
|---|---|---|
| | Jan Sneed | |

## REVIEWING BOARD

**12. REVIEWING BOARD RECOMMENDATIONS AND REMARKS**

**13. SIGNATURE(S) OF REVIEWING BOARD MEMBERS** *(All signatures must be dated)*

| A. CHAIRMAN | B. MEMBER |
|---|---|
| | |

| C. MEMBER | D. MEMBER | E. SECRETARY |
|---|---|---|
| | | |

## ACTION BY APPROVING AUTHORITY

| 14. ACTION | 15. DATE | 16. SIGNATURE AND TITLE OF APPROVING AUTHORITY |
|---|---|---|
| ● APPROVED   ○ DISAPPROVED | 3/17/11 | Principal Deputy Under Secretary for Health |

VA FORM OCT 2008   **10-2543**                                                   Page 2 of 2