IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Case No.:  11-cv-02378-AP


ERMIN KRESO, M.D.,
                    Plaintiff

v.

ERIC SHINSEKI, Secretary, United States Department Of Veterans Affairs, and the UNITED
STATES VETERANS' ADMINISTRATION,
                    Defendants.

---

### PLAINTIFF ERMIN KRESO, M.D.'S OPENING BRIEF

---

TABLE OF CONTENTS

I.          BACKGROUND                                                          2

   A.       FACTUAL HISTORY                                                      2

   B.       PROCEDURAL HISTORY                                                   8

II.         STANDARD OF REVIEW                                                   8

III         ARGUMENT                                                             9

   A.       The Decision to Terminate Dr. Kreso Was Not Supported by            9
            Substantial Evidence

   B.       The Discharge Action Was Not Obtained in Accordance With the        17
            Procedures Required by Law, Rule or Regulation

       1.   The AIB investigation which was relied on by the DAB in
            rendering their decision did not give notice to Dr. Kreso of the
            identity of the patients for whom he was charged with substandard
            care,   required Dr. Kreso to provide a defense to the charges
            without the patients' medical information and refused to allow the
            physicians and nurses with first hand knowledge of Dr. Kreso's
            care for the patients in question to testify.                       17

       2.   The VA failed to disclose to Dr. Kreso copies of all documents,
            transcripts, and memoranda gathered by the AIB which the VA had
            given to the DAB to use against him.                                21

       3.   The DAB's decision was arbitrary and capricious and not in accord
            with the VA policy of penalizing employees in proportion to the
            character of the offense and treating similar offenses with similar
            penalties                                                           23

IV.         CONCLUSION                                                          26

TABLE OF AUTHORITIES

**Cases**

*Bowman Transp. v. Arkansas-Best Freight Sys, Inc.,* 419 U.S. 281, 284, n.2, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974);                                          9

*Brewer v. United States Postal Serv.*, 647 F.2d 1093, 1098 (1981).                                          26

*Brown*, 860 F.2d at 888                                          26

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415-17, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971)                                          8

*Charles v. Blount*, 430 F.2d 665, 666 (7th Cir. 1970)                                          21

*Douglas v. Veterans Admin.*, 5 MSPB 313, 332-3, 5 M.S.P.R. 280 (1981)                                          23, 24, 25

*Gilbert v. Johnson*, 419 F.Supp 859, 876-877 (D.C. GA 1976)                                          20, 22

*Greene v. McElroy*, 360 U.S. 4747, 79 S.Ct. 1400, 3 L.Ed.2d 1377                                          21, 23

*Jackson v. Veterans Admin.*, 768 F.2d 1325 1329 (Fed.Cir.1985)                                          16

*Morgan v. United States*, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129                                          23

*Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992)                                          16

*Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1573-74, (10th Cir. 1994)                                          8

*Stone v. Federal Deposit Ins. Corp.*, 19 F.3d 1368 (Fed.Cir.1999)                                          23

*Streeten v. Wadsworth Veterans Hospital,* 537 F.2d 361 (9th Cir. 1976)                                          18, 19

*United States v. Heffner*, 420 F2d. 809, 811 (4th Cir. 1969).                                          9

*United Sates v. Schwartz*, 176 F.Supp. 613, 615, aff'd, 283 F2d. 107 (3rd Cir. 1960).                                          9

*Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012…                                          23

*Ward v. Brown,* 22 F.3d 516, 521-2 (2d Cir. 1994)                                          24

*Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir.1994)                                          9

**Statutes**

38 U.S.C. § 7462 (f)(1)                                                              8

38 U.S.C. §7462(f)(1) and (2)                                                        8

5 U.S.C.A. Section 706 (2)(A)                                                        8

# I. BACKGROUND

Plaintiff, Dr. Ermin Kreso, was discharged from the U.S. Department of Veterans Affairs on March 12, 2010.  He has instituted this action against the Defendants Eric Shinseki, Secretary, United States Department of Veteran Affairs and the United States Veterans Administration (hereinafter "VA") because his discharge from the VA was not supported by substantial evidence, violated his Fifth Amendment Due Process Rights as well as applicable Veterans Administrative regulations, and was arbitrary and capricious.  Dr. Kreso seeks reinstatement with back pay.

## A.     FACTUAL HISTORY

Plaintiff Dr. Ermin Kreso (hereinafter referred to as "Dr. Kreso") is a physician (*Dr. Kreso*, pp. 690:24-691:4).  During his residency, Dr. Kreso worked at the Denver VA Medical Center, including the Emergency Department, in 2003 (*Dr. Kreso,* pp. 691:24-692:13; 692:24-693:5).  After Dr. Kreso successfully completed his residency program, he applied for formal employment with the Denver VA Medical Center.  His application for formal employment named Dr. Jean Kutner, Medical Director**,** Dr. Thomas Meyer, Medical Director of Ambulatory Care and Residence Medical Directors, Dr. Susanne Brandenburg and Dr. William Kaehny as references.  They were all physicians with the VA Medical Center with whom he had worked (*Dr. Kreso's personnel file*,  D001329).

Dr. Kreso was formally hired in September 2006 by the U.S. Department of Veterans Affairs as a full-time permanent 38 U.S.C. §7401 (1) appointment to work primarily in the emergency department (*Dr. Kreso's personnel file,* D001325*).*

Dr. Kreso received proficiency reports in which he was rated satisfactory and above during the three year period, 2006 through 2009, prior to the commencement of the

2

Administrative Investigative Board ("AIB") investigation (*Dr. Meyer,* p. 52:2-8 (received a 100% out of a possible 100%); *Dr. Baker* p. 105:19-107:4).

### Dr. Kreso's Reporting of Patients at Risk

In early 2009, Dr. Kreso reported areas of concern he believed were putting veteran patients at risk and issues of security to his supervisor, Dr. Thomas Meyer, Associate Chief of Staff for Academic Affiliations.  In April, 2009, Dr. Kreso, concerned by the lack of attention given to his concerns by Dr. Meyer, engaged in certain whistleblowing activity.  Specifically, Dr. Kreso reported to Dr. Weinshenker, Associate Chief of Service for Ambulatory Care that certain medical staff employees were putting veteran patients at risk, including but not limited to, unsafely dispensing medications, and not providing adequate care.  In addition, Dr. Kreso reported to Dr. Weinshenker that security in the VA emergency department was not adequate. *(Dr. Kreso's,* D000849-D000850.

### Investigation

Shortly thereafter, in May, 2009, Lynette Roff, the Medical Center Director, falsely accused Dr. Kreso of misconduct and subjected him to an administrative investigation by the AIB effective May 15, 2009 (*Background, Board Action*, p D000213, D001474-D002036).

During the investigation, the AIB violated various rules and procedures of applicable VA regulations set forth in the VA Administrative Investigations Handbook, such as, *inter alia,* requiring Dr. Kreso to testify before the AIB without knowing the identity of the patients whose care the AIB was questioning or being provided a copy of the patients' medical record, and ordering Dr. Kreso not to speak to anyone about the allegations against him (*Memorandum from Dr. Baker to Dr. Kreso*, D001470; *Dr. Kreso, p. 694:16-20; Rima Nelson, pp. 585:24-586:3*). The VA removed Dr. Kreso to the Compensation and Pension Unit which was located in a

completely different area of the hospital and prevented him from obtaining certain evidence for his defense (*Ms. Roff,* p. 495:17-23).  The AIB also impeded the fact-finding investigation by refusing to call those physicians, nurses and witnesses with first-hand knowledge regarding the treatment of the patients whose care was being questioned (*Dr. Kreso's Supplement to Memo dated November 29, 2009,* D001183*).*  The VA also refused to permit Dr. Kreso's attorney to ask him questions when he testified before the AIB.

### Discharge

On November 13, 2009, Dr. Donald Weinshenker issued a Proposed Discharge memorandum to Dr. Kreso ( D001361-D001365).  The November 13, 2009 Memorandum informed Dr. Kreso that the evidence on which the notice of proposed action was based was attached.  Dr. Kreso responded on November 19, 2009 listing at least eleven Evidence Files that were missing or incomplete (p. D001293).

Over two weeks later, on November 27, 2009, Dr. Kreso attempted to respond to the substance of the allegations against him (D00190-D001199).  He still had not been given the Evidence files that comprised the evidence against him and on which Dr. Weinshenker based his decision in issuing the Proposed Discharge memorandum to Dr. Kreso (*November 27, 2009 Response by Dr. Kreso to Dr. Weinshenker's Memo of November 13, 2001,* D001190*).*  Dr. Kreso noted in his response that Dr. Michael Blieden referred to a number of cases and documents he reviewed with the AIB which were not attached in the Evidence File.  Dr. Kreso asked that he be allowed to supplement his response once he received the missing documents and again requested copies of the documents (D001190-D001191).

Dr. Kreso supplemented his response but without the documents he requested. Thereafter, Dr. Kreso requested a meeting with Director Roff (*Memo from Dr. Kreso to Dr.*

*Weinshenker,* D001159; *Memo from Dr. Kreso to Lynette Roff,* D001200-D001203).  When Dr. Kreso made his written presentations to Director Roff, he still did not know the identity of the patients.

On March 11, 2010, Lynette Roff, executed the Decision Letter on Dr. Kreso's Proposed Discharge sustaining four of the six charges brought against him without ever providing Dr. Kreso the evidence against him or an adequate opportunity to respond (*Memorandum from Lynette Roff to Dr. Kreso*,  D001110).  Significantly, two of the charges that were dismissed – Failure to Follow Supervisor's Instructions and Interfering with the Administrative Investigative Process – were based on Dr. Kreso's attempts to prepare a defense against the false charges (*Memo from AIB to Medical Center Director dated July 31, 2009,*  D00115-D001118).

### Disciplinary Appeals Board

On April 5, 2010, Dr. Kreso appealed his termination to the VA Disciplinary Appeals Board ("DAB") and requested a hearing ( D002165-D002167).  Dr. Kreso argued that the major adverse action taken was in error or should not have been taken because there was no credible, medical testimony or documentary evidence that Dr. Kreso's treatment of care provided to patients was substandard or that he lacked competence to practice medicine (D002165-D002167).

Dr. Kreso again noted in his Notice of Appeal that he had been denied and continued to be denied access to documents which supported his position that the care he provided met the standard of care (D002166).

The Disciplinary Appeals Board hearing commenced on October 13, 2010 (*Board Action*, D002128).  Dr. Kreso again raised concerns and objections at the commencement of the hearing as not meeting due process requirements.  Specifically, Dr. Kreso again notified the DAB that he

continued to be denied access to documents reviewed by the AIB (D000010:11-11:1).   In addition, Dr. Kreso had requested access to the documents in a Freedom of Information Act request which was also denied (D000012:8-D000018:14).   Dr. Kreso appealed to the Central Office for production of these documents which was still pending at the time of the hearing (D001069 – D001070).

On the first day of the DAB hearing, October 13, 2010, Dr. Kreso filed a Motion for Sanctions seeking dismissal of the action taken against him because of an email string that occurred just prior to the hearing on October 9th and 10th, 2010 ( D000018:15-D000019:5; *Motion for Sanctions,* D000909-D000912).   The *ex parte* communication sent by VA physicians, Drs. S. Franzoso, Weinshenker and Blieden, to the DAB members and other witnesses testifying at the hearing claimed police and security were needed at the hearing suggesting Dr. Kreso was violent and that Dr. Kreso should be searched for weapons beforehand (*Motion for Sanctions,* D000909-D000912).   The *ex parte* communication was sent solely to prejudice the DAB Members and portray Dr. Kreso as a violent person in need of some sort of restraint.

Again, the DAB violated various rules and procedures of the applicable VA regulations set forth in the VA Administrative Investigations Handbook including, *inter alia,* not allowing Dr. Kreso to call certain witnesses on his behalf, refusing to make certain witnesses available and by not allowing Dr. Kreso to call an expert witness who would testify that Dr. Kreso met the standard of care in his treatment of the patients alleged in the charges against him (*Correspondence from O'Hare to Ellen Stewart,* D000990, *Correspondence to DAB from Ellen Stewart,* D000920-D00923).

The DAB relied upon testimony at the AIB and evidence introduced to the AIB which was never disclosed to Dr. Kreso and prevented Dr. Kreso from confronting the witnesses and evidence against him.  The DAB specifically made credibility determinations of the witnesses including Dr. Kreso.  The DAB found that "Dr. Kreso's testimony before the DAB was often at odds with his testimony before the AIB and with his representation of the facts in his two written presentations to the Director in response to the proposed removal" (*Board Action,* D0002131). Dr. Kreso's testimony was taken by the AIB without providing him with the requisite knowledge of the identity of the patients for whose care he was being investigated and therefore creating the impression Dr. Kreso was not being entirely truthful (*Dr. Kreso,* p. 694:16-20*; Rima Nelson,* p. 585:24 – 586:3).  Similarly, the DAB also relied on evidence presented by Dr. Kreso to Director Roff which was provided without Dr. Kreso's knowledge of the patients that were the subject of the proposed removal of him from employment at the VA.

The DAB hearing demonstrated that the only basis for Defendants' termination of Dr. Kreso is the campaign began against him after he engaged in whistleblowing activity.

On a date unknown, the DAB issued its decision sustaining in part the charges brought against Dr. Kreso (*Board Action,*  D002128-D002152).  Dr. Sabharwal, a member of the DAB, wrote a minority opinion concurring with some of the findings of the DAB but significantly found one of the charges was only partially sustained and another charge was not sustained (*Board Action*, D002149).  In addition, Dr. Sabharwal stated in her opinion that part of the reason for the impression that Dr. Kreso did not treat patients as other at the VA would was based upon his ethnic background (*Board Action*,  D002151).

The DAB affirmed the excessive penalty of Dr. Kreso's discharge again violating the VA's own rules and regulations by failing to impose a like penalty for like offenses as required

7

(*DAB,* D002127).  The DAB failed to take into consideration the Douglas Factors that it is required to use to determine whether a penalty is appropriate.  Significantly, Dr. Sabharwal, the only ethnic minority on the panel and the only physician holding a similar position to Dr. Kreso, disagreed with the penalty of discharge (*Board Action*, D002149).

**B.** **PROCEDURAL HISTORY**

Dr. Kreso timely appealed the decision of the AIB, confirmed by the Director and the secretary, to discharge him and requested a hearing (*Board Action*, D002128). The DAB hearing was conducted from October 13, 2010 through mid-day on October 15, 2010 (*Board Action*, D002129). The DAB issued a decision sustaining in part the charges brought against Dr. Kreso (*Board Action,* D002128-D002152). By letter dated March 17, 2011, Robert Jesse, MD, Principal Deputy Under Secretary for Health affirmed the decision of the DAB. The Deputy Under Secretary's decision constituted final administrative action of Dr. Kreso's appeal to the DAB (*DAB*, D002127).

Dr. Kreso timely filed his Complaint with the United States District Court, District of Colorado, on September 9, 2011, seeking judicial review of the VA's major adverse action of termination imposed on him pursuant to 38 U.S.C. § 7462 (f)(1).

## II. STANDARD OF REVIEW

The statutory basis for judicial review of a Disciplinary Appeals Board decision is found at 38 U.S.C. §7462(f)(1) and (2). Under subsection (2), "…the Court shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) obtained without procedures required by law, rule or regulation having been followed; or (C) unsupported by substantial evidence."

Although the agency's decision should be a presumption of regularity, there are limits to the rule, such as when agency's action was arbitrary, capricious, abuse of discretion or otherwise not in accordance with law, 5 U.S.C.A. Section 706 (2)(A); *Citizens to Preserve Overton Park,*

*Inc. v. Volpe,* 401 U.S. 402, 415-17, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971); *Olenhouse v.*

*Commodity Credit Corp.,* 42 F.3d 1560, 1573-74, (10th Cir. 1994).

An agency of the government must scrupulously observe the rules, regulations, or

procedures it has established.  When it fails to do so, its action cannot stand and courts will strike

it down.  *United States v. Heffner*, 420 F2d. 809, 811 (4th Cir. 1969).  This rule is strictly applied

when constitutional or statutory rights are violated.  *United Sates v. Schwartz*, 176 F.Supp. 613,

615, aff'd, 283 F2d. 107 (3rd Cir. 1960).

### III.  ARGUMENT

**A.    THE DECISION TO TERMINATE DR. KRESO WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

The Certified Administrative Record of Dr. Kreso's discharge demonstrates that there

was not substantial evidence to support a finding that Dr. Kreso failed in any way to provide

adequate patient care.

The substantiality of the evidence must be based upon review of the record as a whole,

and the Court is not free to disregard contrary evidence in the record.  *See Bowman Transp. v.*

*Arkansas-Best Freight Sys, Inc.,* 419 U.S. 281, 284, n.2, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974);

*Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir.1994).

The Disciplinary Appeals Board (hereinafter "DAB") sustained three of the specifications

in Charge 1 accusing Dr. Kreso of failing to attend to five patients presenting to the emergency

department for treatment.  (*DAB, Board Action*,  D002147).

**Charge 1 – Failure to attend to patients presenting to the Emergency Department for treatment**

**Specification 1-WB**

The first patient, WB, presented to the Emergency Department with a complaint that his urinary catheter was not draining (*DAB* 1403).  The patient was triaged and seen by Florence McNeal, R.N.  Ms. McNeal[1] treated the patient by repositioning the Foley catheter, deflating and re-inflating the bulb resulting in a catheter that was draining well ((*Medical Record of Patient WB,* D001403).  Upon discharge, the patient was comfortable and understood the discharge instructions (*Medical Record of Patient WB,* D001404,).

There was testimony at the DAB Hearing ("Hearing") by several witnesses, both physicians and nurses that the repositioning, deflating and re-inflating of a Foley catheter is well within the scope of nursing practice in Colorado.  (*Judicial Notice by Dr. O'Hare,* p. 97:5-7; *Dr. Baker,* p. 126:10-127:6; *Dr. Weinshenker,* p. 431:5-10; *Dr. Kreso, p.* 696:7-19.)  The testimony also confirmed that Dr. Kreso was informed of the actions of Nurse McNeal and that he concurred in her treatment of the patient (*Board Action*, D002132).  There was no evidence of any harm to this patient.  The patient's vital signs were all within the normal range (*AIB Exhibit G-1*).  Further, there was no evidence that this patient requested to be seen by a physician *(Dr. Kreso,* p. 697:9-12*)*.

The DAB's finding of substantial evidence to sustain this charge is contrary to the testimony and evidence in this case.  The DAB sustained the charge based on testimony by Dr. Weinsheinker and Dr. Meyer that discharging the patient from the ED without being afforded a medical screening ran contrary to the expectations that all patients receive a screening exam and did not fulfill their obligation under the EMTALA (*Dr. Weinshenker,* p. 359:18-20, *Dr. Meyer*, pp. 43:23-44:6).  The Board, however, completely ignored testimony by Dr. Meyer explaining that the VA was making greater efforts to get non-emergent patients out of the ED and instead

---

[1] Ms. McNeal was listed as a witness by Dr. Kreso, is a current employee of the VA Medical Center in Denver, did not appear at the DAB Hearing and provided no testimony during the AIB investigation.

treat them in a clinic appointment (*Dr. Meyer,* p. 64:5-25*)*.  The Board also ignored the series of emails ( D002046-D002087) written by Dr. Weinshenker collaborating Dr. Kreso's testimony that certain level triage patients were not to be seen in the ED (*Dr. Roff*, p. 545:2-5) (not seen a policy and procedure in the emergency department that says physicians must treat every patient who walks in the door).

There was no dissemination from the Director's office, through Center Memoranda, of VHA policy regarding the functioning of VA EDs.  "We should have a Center Memorandum regarding the implementation of EMTALA at our VA" (*Dr. Roff,* p. 216:18-22).

Three supervisors of the ED (Dr. Meyer, Dr. Baker, and Dr. Weinshenker) testified no written policies or guidance had been generated regarding the EMTALA (the Emergency Medical Treatment and Active Labor Act 42 USC 1395dd).  "I doubt there were written policies" (*Dr. Meyer, p. 65:8-11*); "…regarding triage there is nothing authored by me or Dr. Weinshenker or the hospital…" (*Dr. Baker,* pp. 136:24-137:14*)*; "I am not sure exactly how the emergency room is trained in this" (*Dr. Weinshenker,* p. 357:4-5); "I don't believe there was a specific policy or communication regarding EMTALA"; "I am concerned that you did not find any written policy regarding triage" (*Dr. Roff,* p  555:9-14*)*.

The DAB lacked any evidence to support this charge based on the uncontroverted testimony of Dr. Kreso that since this patient was a level 5 triage patient that he did not need to be seen by a doctor (*Email string*, D002046-D002087).  This is confirmed by the undisputed testimony that Nurse West triaged patient WB and did not request Dr. Kreso see the patient (*Dr. Kreso,* p. 697:9-12*)*.

The DAB completely ignored the email string introduced into evidence by Dr. Kreso and the fact that it was written by Dr. Weinshenker to establish guidelines for the care of ESI

Category 5 Patients and that corroborated Dr. Kreso's treatment of patient WB. Dr. Weinshenker's email addresses seeing patients with a triage level of 5, the lowest acuity rating, and confirms that patients with level 5 ratings are to be moved from the ER to clinic appointments (*Email string,* D002046-D002087*).* Dr. Weinshenker advises that "[i]deally, the ER wouldn't see any patient that doesn't need ER resources. There will be ongoing efforts to move in that direction." (*Email string,*  D002087.) The Emergency Department Policy provided to the veterans emphasizes that "this department's primary function is to treat Emergency and Urgent medical conditions only" (*Dr. Baker,* pp. 117:19-118:7,  118:12-119:11, D002342-D002343).

## Specification 2 - DW

The second patient, DW, never presented to the Emergency Department for treatment (*DAB Board Action*, p. 2133). The veteran presented to the Administrative Officer on Duty with a request for lodging (*Board Action,* p. 2133*, Officer Weston,* p. 227:11-22*, Dr. Kreso,* pp. 702:21-703:19). Dr. Kreso testified, that at the time he spoke to DW and informed him that in order to be lodged he would need sufficient supplemental oxygen, that DW was not short of breath and in no acute distress (*Dr. Kreso,* pp. 53:5-20; 706:1-19, see also *Officer DeDiemar*, p D000607:20-608:4*).*

The DAB's reliance on the lay testimony of one of the two police officers does not provide substantial evidence for sustaining this charge. Dr. Sabharwal did not find the charge was sustained. Dr Sabharwal determined:

> …there was not sufficient evidence that the patient was in respiratory distress requiring medical services of a provider and no evidence that patient checked into the emergency room. (*DeDiemar Transcript,* pp. 265:9-14; 266:2-10; 267:13-17; 268:3-7; 276:23) testimony contradicted Officer Weston's testimony

(*Testimony AIB,* 6:14-19 by the AOD, 7:10-12) (*Weston Transcript,* pp. 206:7-12, 215:13-14, *Board Action, DAB,* p. 2150).

The DAB lacked substantial evidence to sustain the charge against Dr. Kreso for failing to attend to patients presenting to the emergency department for treatment since here there is no evidence in the record that this veteran was ever checked into the Emergency Department for treatment.  This case involves a patient who presented for lodging, not care and treatment. Ultimately, the veteran received oxygen and was lodged.

### Specification 5 - IS

Patient IS suffers from multiple chronic conditions including sleep apnea (*IS Testimony,* p. 310:17-25).  IS stated he was a registered nurse (*IS Testimony,* p.  300:7-15).  He testified that Dr. Kreso failed to perform a complete medical exam when he presented to the Emergency Department with "problems breathing for the last couple of days that at night I cannot lay down sleep" [sic] according to the triage notes (*IS testimony,* pp. 308:17-309:6).[2]  IS also stated he believed Dr. Kreso's counseling him on the improper use of the Emergency Department was not appropriate (*IS Testimony*, p. 301:8-24).  IS filed a complaint with the VA Medical Center (*IS Testimony*, pp. 304:25-305:4).   Dr. Baker, Dr. Kreso's supervisor, never responded to the complaint[3] according to IS, although she faults Dr. Kreso for his treatment of this patient (*IS Testimony*, pp. 306:9-22).

The DAB sustained this specification despite the testimony above even after finding that it was probable that IS did not emphasize chest pains to the triage nurse and that IS is inaccurately recalling that detail (*Board Action,* D002139).  Dr. Kreso testified IS had normal

---

[2] IS testified that he presented to the ED with chest pains and shortness of breath but there is no record of this in the progress notes of the nurse or Dr. Kreso (D001442-D001445).
[3] The evidence shows Dr. Baker even had to be reminded to answer the complaint and she continued to ignore this patient (*IS Testimony*, p. 306:9-22).

vital signs and never complained of chest pains or shortness of breath (*Dr. Kreso,* pp. 734:5-735:7).

The DAB does not cite to any evidence that Dr. Kreso did not perform a chest exam, other than the patient's testimony that Dr. Kreso just examined his upper back.  Dr. Kreso testified that he performed an ENT exam and listened to all four lobes (*Dr. Kreso*, pp. 735:11-736:16*).*

The Board sustained Specification 5 without a scintilla of evidence that Dr. Kreso failed to attend to patient IS and instead found against Dr. Kreso on evidence only that patient IS was dissatisfied with the encounter because Dr. Kreso told him not to utilize the ED resources for issues such as this in the future *(IS testimony,* p. 301:8-24*).*  Dr. Sabharwal again found there was insufficient evidence to sustain this specification (*Board Action,* D002150).

## Charge 3 – Patient Neglect – Delay of Care to Patients

Specification 1 – GS.  GS was a patient of Dr. Kreso's on many prior occasions and it was clear that they had a good rapport (*Dr. Kreso,* p.744:4).  Dr. Kreso testified that he would have not decreased the triage level on GS as he knew his condition and in fact would have increased it (*Dr. Kreso,* p. 744:1-6).[4]  It also is highly suspect that Dr. Kreso was even the person who changed the triage level as the patient was not even triaged until the last hour of Dr. Kreso's shift (*Dr. Kreso,* pp. 744:21-745:19).  There would be no reason for him to change this level.

The only testimony to support the Board's finding was that of Nurse Back who the Board found to be "overly antagonistic" toward Dr. Kreso (*Board Action,* D002131).  Dr. Kreso denied seeing this patient (*Dr. Kreso,* p. 743:19-21).  In addition, the wife of the patient, GS, stated they knew Dr. Kreso and never testified Dr. Kreso was the physician working that night.  MS testified

---

[4] In his response to the Proposed Discharge, Dr. Kreso indicated he might have changed this triage level but testified he did not know the name of the patient until one week before the Hearing and not at the time of his response to the Proposed Disciplinary Letter (*Dr. Kreso,* pp. 742:14-19, 743:10-13).

they had no complaints about the care given by Dr. Kreso to her husband (*Patient GS testimony through his wife, MS*, p. 331:24-332:9).

## **Charge 6 – Disruptive Behavior**

The final Charge brought against Dr. Kreso was for alleged disruptive behavior between him and Judy Cooley, Legal Compensation and Pension (C&P) Program Support Assistant.

At the DAB hearing, Dr. Kreso had his first opportunity, in person, to tell his side of the story regarding this allegation, as it was not part of the AIB investigation (*Dr. Kreso*, p. 756:15-20).  He indicated that he did not perceive that Ms. Cooley was feeling intimidated and when he learned of that fact, he apologized to her (*Dr. Kreso*, pp. 756:21-757:9).  Dr. Kreso stated that he did not apologize to her in person as he was prevented from seeing her by a directive from Dr. Weinshenker (*Dr. Kreso,* p. 757:2-8).   Dr. Kreso does not deny that an incident occurred, however, it is clear from the evidence that the incident was blown all out of proportion and continued to be before the Hearing.  At no time did Ms. Cooley testify that she was so upset she was afraid to go home after the incident and also did not testify that she asked him to leave the area (*Judy Cooley,* p. 264:6-15).

The Board sustained this Charge without any evidence to support a finding of disruptive behavior.  In fact, while the Board asserts that Ms. Cooley felt uncomfortable and threatened by Dr. Kreso's behavior, Ms. Cooley testified that she didn't ask Dr. Kreso to move, and didn't tell him she was nervous (*Judy Cooley,* p. 264:6-15).  Dr. Franzoso, a psychiatrist who observed the situation, felt no need to come out and help Ms. Cooley or intervene (*Judy Cooley,* pp. 248:5-18, 278; *Dr. Franzoso,* pp. 276:5-21, 278:3-9).  Neither Ms. Cooley or Dr. Franzoso wrote a report of the incident until they were asked to do so by Ms. Cooley's and Dr. Kreso's supervisor (*Dr. Franzoso*, p. 280:12-14).

Dr. Sabharwal found that the evidence that came out in the hearing, while it may have been inappropriate and confrontational, did not rise to the level of disruptive evidence *(Board Action,* D002151*)*.

"Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion…[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict…" *Jackson v. Veterans Admin*., 768 F.2d 1325 1329 (Fed.Cir.1985).   "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

The DAB concluded that only two (2) of the charges against Dr. Kreso involved "a component of substandard care" specifically, Charge 1-Specification 2 and Charge 3-Specification 1 (*Board Action,* D002148*)*.

As set forth above, Specification 2 in Charge 1 relating to the care of Patient DW, had nothing to do with Dr. Kreso's failure to attend to a patient presenting to the ED for treatment and therefore the Board could not have substantial evidence to sustain this charge.   Rather, Patient DW presented for lodging.  At no time did this patient seek treatment in the Emergency Department nor was he ever admitted to the Emergency Department.

The other Charge the Board sustained against Dr. Kreso for neglecting patients care lacked any evidence to support the Board's finding that Dr. Kreso actually treated GS.  Dr. Kreso testified he knew GS, and would have increased his triage level, not decreased it.  The Board relied solely on Nurse Back's testimony who they had previously determined to be "overly antagonistic towards Dr. Kreso" (*Board Action*, D002131).

Regarding the other Specification in Charge 1, which also did not contain any allegations of substandard care, the evidence is undisputed that triage level 5 patients did not require to be seen by a physician and that treatment by a nurse was sufficient. Patient WB, was determined to be a level 5 triage patient and therefore properly treated at the ED.

The final Charge sustained by the DAB for disruptive behavior against Dr. Kreso was based on the Board's conclusions that Ms. Cooley was threatened by Dr. Kreso's behavior. Ms. Cooley's own testimony and the testimony of Dr. Franzoso, who was there but did not feel the need to intervene, does not rise to the level of disruptive behavior.

A. **THE DISCHARGE ACTION WAS NOT OBTAINED IN ACCORDANCE WITH THE PROCEDURES REQUIRED BY LAW, RULE OR REGULATION**

1. The AIB investigation which was relied on by the DAB in rendering their decision did not give notice to Dr. Kreso of the identity of the patients for whom he was charged with substandard care, required Dr. Kreso to provide a defense to the charges without the patients' medical information and refused to allow the physicians and nurses with first hand knowledge of Dr. Kreso's care for the patients in question to testify.

38 U.S.C. § 7462 provides the procedures for taking major adverse actions involving professional conduct or competence against VA employees appointed under the provisions of section 7401(1). The Certified Administrative Record of the discharge action reflects that Dr. Kreso's discharge was not taken in accordance with the procedures provided in 38 U.S.C. § 7462 and applicable VA regulations.

The Veterans Administration regulations provide for due process for Section 7401 employees in any case in which charges are brought arising out of a question of professional conduct or competence which could result in major adverse action against the employee. (*V.A. Manual MP-5*, Part 1, Chap. 12, Section A, and G-1; *VA Directive 5021*, App A 4(d) 1009-1011). The right to a fair proceeding requires at a minimum, that the employee be given notice

of the charges and the evidence against him, *Streeten v. Wadsworth Veterans Hospital*, 537 F.2d 361, 368-369 (9th Cir. 1976).  The AIB investigation, which became part of the DAB file and was relied on by the DAB in its decision to discharge Dr. Kreso, did not inform Dr. Kreso of the charges against him when he testified.  Dr. Kreso was told only that the purpose of the AIB investigation was to look at acts of omission or commission in his care.  He was not given his notes of the care he provided prior to or during his testimony before the AIB, in spite of his request for, at the very least, the names of the patients (*Dr. Kreso*, p. 694:16-20).  Contrary to fundamental due process, Dr. Kreso was not told the names of the patients he was accused of providing insufficient care or allowed to review their medical records.

The Notice of Proposed Discharge issued by Dr. Donald Weinshenker on November 13, 2009, did not attach the evidence on which the notice of proposed action was based as set forth in Dr. Weinshenker's correspondence.  Dr. Kreso wrote Dr. Weinshenker listing at least 11 Evidence Files that were alleged to be attached to the Notice of Discharge and were missing or incomplete.  (*Correspondence from Dr. Kreso to Dr. Weinshenker dated November 17, 2009*, D001158).

On November 29, 2009, Dr. Kreso responded to the substance of the allegations against him still without having been able to review the missing documents and exhibits.  He again noted additional missing documents and exhibits that were considered by the AIB but were not included in the Evidence File provided by the AIB (*Memorandum from Dr. Kreso to Director dated November 29, 2009*, D001208-D001218).  Dr. Kreso noted that Dr. Michael Blieden referred to a number of cases and documents he reviewed with the AIB which were not attached in the Evidence File (*Memorandum from Dr. Kreso to Director dated November 29, 2009,*

D001208).  Dr. Kreso asked that he be allowed to supplement his response once he received the missing documents.

Notice of the charges and knowledge of the evidence against an employee are the cornerstones of due process required even where the property interest in continued employment is less than the procedural due process protection provided to Dr. Kreso as a full time § 7401(1) employee.  In *Streeten v. Wadsworth Veterans Hospital*, a resident physician in pathology at a veteran's hospital brought suit to enjoin his dismissal from the residency program, *Streeten v. Wadsworth Veterans Hospital,* 537 F.2d 361 (9th Cir. 1976).  The U.S. District Court enjoined the physician's dismissal and defendants appealed.  The Ninth Circuit Court of Appeals found that residents are not "physicians" within the statute providing for a full adversary hearing in front of a disciplinary board.  Even so, the Court found that a resident's interest is important enough that he should have notice of his deficiencies, should have an opportunity to examine the evidence against him, and should be allowed to present his side of the story to the decision-maker.  *Id.* at 368-369.  These procedures will insure that all relevant data is before the decision-maker and will allow the terminated resident and any reviewing court to judge whether the decision-maker acted in bad faith or arbitrarily and capriciously.  <u>*Id.*</u>

This lack of fundamental due process was further compounded at the DAB hearing.  The DAB compared Dr. Kreso's testimony to his testimony at the AIB and determined he was not credible because his testimony at the AIB was different as to some patients than his testimony at the DAB (*Board Action,* 2131).  However, as set forth above, Dr. Kreso's testimony was given at the AIB without knowing who the patients were that were in question, without having his notes of medical care of the patient and without having the patient's medical records (*Dr. Kreso,* p. 694:16-20*; Rima Nelson,* pp. 585:24 – 586:3).  Dr. Kreso testified during the DAB, for example,

that he had thought the AIB was asking him about a different patient than patient GS when he testified he had changed the patient's triage level (*Dr. Kreso*, pp. 742:14-19; 743:10-13).

The Veterans Administration Regulations provide for the following principal due process procedures before a V.A. disciplinary board:

> h.     The employee will have the right to call upon witnesses, who, if willing to testify, will be heard.  The Chairman, Disciplinary Board, will, on his own initiative or at the request of the employee, call such witnesses as may be necessary to develop the evidence.  It will be considered the duty of all VA employees who appear as witnesses to furnish information fully and honestly whether it be favorable or derogatory to the employee charged.

> i.     The Chairman, Disciplinary Board, will permit the parties to the case to ask questions of witnesses and will use reasonable discretion to exclude irrelevant testimony in order to uncover, develop and consider all pertinent facts.  Both sides will have opportunity to properly present and support their respective positions upon any question or matter presented to the board for decision.

> p.     The findings and recommendations of a Disciplinary Board will be based solely on the evidence presented and will not be influenced by any knowledge of other factors in the case.

> *Gilbert v. Johnson*, 419 F.Supp 859, 876-877 (D.C. GA 1976)

Despite Dr. Kreso's requests and the principal due process procedures set forth above, the DAB refused to allow Dr. Kreso to call an expert witness to testify that Dr. Kreso's treatment of the patients called into question in the charges, met the standard of care and other witnesses with first hand knowledge of the care for the patients provided by Dr. Kreso, including Florence McNeal (*Dr. Kreso's Initial Witness List*, D000921-D000922, *Correspondence from O'Hare to Ellen Stewart,* D000990).

2.    **The VA  failed to disclose to Dr. Kreso copies of all documents, transcripts, and memoranda gathered by the AIB  which the VA had given to the DAB to use against him.**

The VA  failed to disclose to Dr. Kreso copies of all documents, transcripts, and memoranda gathered by the AIB  which the VA had given to the DAB to use against him including the report of a consulting expert relied on by the DAB in rendering their decision.

The minimal requisites of due process in the administrative hearing is defined as whether the employee was accorded a fair and open hearing on articulated charges with the right of confrontation and cross-examination, *Charles v. Blount*, 430 F.2d 665, 666 (7th Cir. 1970).  Dr. Kreso was denied his right of confrontation and cross-examination because documents, transcripts, and other memoranda including VA expert, Dr. J. Brian Hancock's report were relied on by the DAB without giving Dr. Kreso the opportunity to review them, ask or cross-examine witnesses questions about them or the drafters of the report (*Dr. Hancock's Report*, p D000926-D000928).

An employee's denial of the right to effectively cross-examine and confront the evidence and witnesses against him denies him due process of law.  In *Greene v. McElroy*, the Supreme Court held that Greene's right to hold private employment, in this case a security clearance, required he be allowed to cross-examine and confront the evidence and witnesses against him, *Greene v. McElroy,* 360 U.S. 474, 79 SCt 1400, 3 L.Ed 2d 1377 (1959).  The Court specifically found that the agency, the Industrial Security Board, could not question Greene from secret reports and confidential statements which the Board did not show him for security reasons. The Court stressed that the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.  It is even more important, the Court noted, where the evidence consists of the testimony of individuals whose memory might

be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy.

> The Greene Court emphasized:
>
> Certain principles have remained relatively immutable in our jurisprudence.  One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.  While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy.  We have formalized these protections in the requirements of confrontation and cross-examination.  They have ancient roots.  They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right 'to be confronted with the witnesses against him…This Court has been zealous to protect these rights from erosion.  It has spoken out not only in criminal cases but also in all types of cases where administrative and regulatory actions were under scrutiny.'

*Id*. at 1413-1414 (citations omitted).

Here, the DAB relied on the testimony of Patricia Lyman, Sylvia Murray, Karla Perkins, Kim Ator, Michael Blieden, Francis Keffler, Mark Phillips, Carlos Montoya and Ann Jordway, without allowing Dr. Kreso to cross-examine these witnesses and demonstrate to the DAB their inconsistencies, and bias. *See e.g. Gilbert v. Johnson* (reports of preliminary investigation preceding letter of charges against physician did not substantially prejudice any due process rights of physician where **neither** physician nor disciplinary board had access to preliminary investigation reports compiled by Veterans Administration, and all evidence, documents and witness statements presented against physician at hearing were available for inspection, confrontation and cross-examination) (emphasis added).  *See also Charles v. Blount*, 430 F.2d 665, 666 (7th Cir. 1970) (in reviewing the employee's discharge for its conformance with the requirements of administrative due process, defined the minimal requisites of due process as:

23

"…i.e., whether the employee was accorded a fair and open hearing on articulated charges with the right of confrontation and cross-examination. *Morgan v. United States*, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129…; *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012…; *Greene v. McElroy*, 360 U.S. 4747, 79 S.Ct. 1400, 3 L.Ed.2d 1377…"

The DAB relied on *ex parte* contact with Dr. J. Brian Hancock, allegedly a Chief of Staff who expressed the opinion that "Dr. Kreso has demonstrated multiple episodes of failure to meet acceptable standards of clinical practice, patient abandonment, and potential violation of the Emergency Medicine Treatment and Active Labor Act, disruptive behavior and the creation of a hostile work environment (*Dr. Hancock's Report*, D000928)." Dr. Kreso was denied his due process rights to cross-examine this undisclosed expert, or question him on the documents or testimony he reviewed in making his opinion or even his expertise to render an opinion in this case.

This evidence was new and material information violating Dr. Kreso's due process guarantee of notice. "[T]he introduction of new and material information by means of *ex parte* communications to the deciding official undermines the public employee's constitutional due process guarantee of notice…and the opportunity to respond…. It is constitutionally impermissible to allow a deciding official to receive additional material information that may undermine the objectivity required to protect the fairness of the process." *Stone v. Federal Deposit Ins. Corp.*, 179 F.3d 1368, 1376-1378 (Fed.Cir.1999).

3.    **The DAB's decision was arbitrary and capricious and not in accord with the VA policy of penalizing employees in proportion to the character of the offense and treating similar offenses with similar penalties**

The DAB's penalty was arbitrary and capricious because the DAB did not consider the relevant factors and strike a reasonable balance within tolerable limits of reasonableness as required by the VA regulations. *Douglas v. Veterans Admin*., 5 MSPB 313, 332-3, 5 M.S.P.R.

280 (1981).  *Douglas* lists twelve factors that courts and review boards should use to determine

whether a penalty is appropriate:

1) the nature and seriousness of the offense, and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public and prominence of the position;

3) the employee's past disciplinary record;

4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties.

6) consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7) consistency of the penalty with any applicable agency table of penalties;

8) the notoriety of the offense or its impact upon the reputation of the agency;

9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

10) potential for the employee's rehabilitation;

11) mitigating circumstances surrounding the offense such as unusual job tension, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter;

and

12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

The DAB and therefore the Under Secretary failed to consider the sixth *Douglas* factor,

the consistency of the penalty with those imposed upon other employees for the same or similar

offenses.  *Douglas,* 5 MSPB at 332, 5 M.S.P.R. 280.  *See Ward v. Brown,* 22 F.3d 516, 521-2 (2d

Cir. 1994) (reversing discharge for failure to consider regulation mandating that VA employees

be given like penalties for like offenses).

In addition, while acknowledging there were mitigating circumstances, the DAB failed to

consider the mitigating factors that would counsel against dismissal.  The Board relied solely on

Ms. Roff's analysis and concluded that she had reached her conclusion in an appropriate fashion. 'Douglas Factor Analysis.' Ms. Roff testified she did not look at any mitigating factors (*Roff*, *p. 539:4-9*). Nowhere does the Board mention Dr. Kreso's high performance or even how all these complaints occurred within a 3-month period of time (*Dr. Meyer, p.* 52:2-8 (received a 100% out of a possible 100%); *Dr. Baker* pp. 105:19-107:4).

It is also undisputed that the VA failed to give Dr. Kreso notice that his behavior was not acceptable and also failed to provide him counseling as required by VA regulations and another factor the DAB should have taken into consideration in deciding Dr. Kreso's penalty (*Dr. Meyer*, pp. 66:16-67:10; <u>*Douglas*</u> at 332-3).

Each of Dr. Kreso's supervisors failed to bring a formal progressive disciplinary course of action that might have altered Dr. Kreso's behavior.  "I did not consider my discussions with Dr. Kreso formal counseling."  (*Dr. Meyer,* p. 66:16-22); "Not written, but we have spoken about that" (*Dr. Baker,* p. 110:5-18*)*; "No counseling action was ever taken for the charges before this Board" (*Dr. Baker*, pp. 142:9-143:5, *Dr. Weinshenker Transcript*, p. 110:12-14).

Dr. Kreso's supervisors did not consider alternate approaches to altering his behavior as outlined in the Medical Staff By-Laws the governing document for the medical staff at the VA hospital.

Dr. Sabharwal noted these mitigating factors and determined that the penalty of discharge was not warranted (*Board Action,* D002149).  Yet the DAB did not even consider these mitigation factors, each one of which is a factor required to be considered in its penalty determination:

- No prior disciplinary action by Veterans Administration;
- No actual harm to patients or VA reputation or public image;
- Lack of documented progressive discipline or counseling;
- No evidence of intentional wrongdoing.

- Excessive duty hours (70 hours in a week) contributing to job related stress;
- No defined Emergency room triage policy, lack of clarity instructions and supervision

(*Board Action*,  D002149)

Dr. Sabharwal advised in her minority opinion that two of the Board members (including herself) believed the penalty of discharge was an extreme/harsh choice and that she disagreed with the penalty of discharge (*Board Action*, D002149).

The Court must examine the severity of the penalty in light of factors such as "the range of permissible punishment specified by statute or regulation, the disciplined party's job level and nature, his record of past performance, the connection between his job and improper conduct charges, and the strength of the proof that the conduct occurred."  *Brown*, 860 F.2d at 888 (quoting *Brewer v. United States Postal Serv.*, 647 F.2d 1093, 1098 (1981).

The DAB has provided an insufficient explanation for its penalty and blatantly failed to take into consideration the mitigating factors required by VA regulations.

## IV.  <u>CONCLUSION</u>

The DAB decision, approved by the Under Secretary, was not supported by substantial evidence, was obtained without procedures required by law, rule or regulation having been followed, and was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the VA policy of penalizing employees in proportion to the character of the offense and treating similar offenses with similar penalties.  The Court should remand this matter back to the Defendants for a proper hearing including fundamental due process and a proper weighing of the Douglas factors in determining its penalty, if any, against Dr. Kreso.

Respectfully submitted this 18th day of June, 2012.

BERENBAUM WEINSHIENK PC

*Original signature on file at Berenbaum Weinshienk PC*

 s/ *Rosemary Orsini*
Rosemary Orsini
Ellen Elizabeth Stewart
370 Seventeenth Street, Suite 4800
Denver, Colorado 80202
Telephone: (303) 592-8305
Facsimile: (303) 629-7610

## CERTIFICATE OF SERVICE

I hereby certify that on this day of 18th day of June, 2012, a true and correct copy of the foregoing **PLAINTIFF DR. KRESO'S OPENING BRIEF** was served via e-mail transmission upon the following counsel of record:

Susan Prose
Assistant United States Attorney
U.S. Attorney's Office for the District of Colorado
1225 17th Street, Suite 700
Denver, CO  80202
susan.prose@usdoj.gov

*Original document on file at Berenbaum Weinshienk PC*

 */s / Sherrol Hall*
Sherrol Hall

28