**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Robert E. Blackburn**

Civil Case No.1 11-cv-02378-REB-MJW

ERMIN KRESO, M.D.,

     Plaintiff,

v.

ERIC SHINSEKI, Secretary, United States Department of Veterans Affairs, and
THE UNITED STATES VETERANS' ADMINISTRATION,

     Defendants.

---

## ORDER AFFIRMING AGENCY ACTION[1]

---

**Blackburn, J.**

     This matter is before me on the **Plaintiff Ermin Kreso, M.D.'s Opening Brief**

[#28][2] filed June 19, 2012.  The defendants filed a response [#31], and the plaintiff filed

a reply [#37].

     The plaintiff, Ermin Kreso, M.D., was an employee of the United States

Department of Veterans Affairs (VA).  His employment was terminated by the VA.  In

this case, he challenges his termination and seeks review of the findings on which his

termination was based, reversal of his termination, reinstatement, and back pay.  I

affirm the decision of the VA.

---

[1]  This order is entered to correct certain typographical errors which exist in the **Order Affirming Agency Action** [#38] issued by the court on September 2, 2014.  Those typographical errors exist on pages 2, 13, 14, 15, 16, 17, and 22 of that order [#38].  Except for these corrections and the addition of this footnote, the present order is identical to the previous order [#38].  The present order does not alter in any way the analysis and conclusions of the court.  The present order shall supplant the previous order [#38].

[2]  "[#28]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

## I.  JURISDICTION

Under 38 U.S.C. § 7462, an employee affected adversely by a final order or

decision of a Disciplinary Appeals Board may obtain judicial review of the order or

decision.  Dr. Kreso seeks review of a decision by a Disciplinary Appeals Board.  This

court has jurisdiction under both § 7462 and 28 U.S.C. § 1331 (federal question).

## II.  STANDARD OF REVIEW

Section 7462(d)(2) provides the applicable standard of review.

(2) In any case in which judicial review is sought under this subsection, the
court shall review the record and hold unlawful and set aside any agency
action, finding, or conclusion found to be–

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law;

(B) obtained without procedures required by law, rule, or regulation having
been followed; or

(C) unsupported by substantial evidence.

Generally, an agency is required to follow its own regulations.  ***Bar MK Ranches***

***v. Yuetter***, 994 F.2d 735, 738 (10th Cir. 1993).  However, "an agency's interpretation of

its own regulations, including its procedural rules, is entitled to great deference."  ***Id***.

Such interpretations are subject to rejection only when they are "unreasonable, plainly

erroneous, or inconsistent with the regulation's plain meaning."  ***Id***.

When reviewing the factual findings of an agency, the evidence on which such

findings are based must be substantial, meaning "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  ***Olenhouse v.***

***Commodity Credit Corp.***, 42 F.3d 1560, 1581 (10th Cir. 1994).  "Evidence is not

substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion."

***Id***. (citations omitted).  The substantiality of the evidence must be based on a review of

the record as a whole, and the reviewing court is not free to disregard contrary evidence in the record.  **Washington v. Shalala**, 37 F.3d 1437, 1439 (10th Cir. 1994).  An agency's decision is entitled to a presumption of regularity, but that presumption does not shield agency action from thorough review.  **Olenhouse v. Commodity Credit Corp.**, 42 F.3d 1560, 1574 (10th Cir. 1994).  When the VA takes a major adverse action, such as termination, against an employee in the classification held by Dr. Kreso, "(t)he Department bears the burden of proving by a preponderance of the evidence the charges that form the basis for the action."  *VA Directive 5021/3, Appendix A*, § 6.b.; D1009.

> Applying the arbitrary and capricious standard, a reviewing court must
>
> ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made. In reviewing the agency's explanation, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment.  Agency action will be set aside if the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

**Olenhouse**, 42 F.3d at 1574 (footnotes, citations, and internal quotation marks omitted).

## III.  FACTS

I review here the basic facts which underlay this case.  In many of the issues raised by Dr. Kreso, there is some dispute about the proper view of the evidence presented to the Disciplinary Appeals Board (DAB) which made the final decision to terminate the employment of Dr. Kreso.  In addition, Dr. Kreso challenges the propriety of some of the factual determinations of the DAB.  The details of these disputes about

the evidence and fact findings are detailed in the analysis below.[3]

Dr. Kreso was a full time, permanent employee employed by the VA to work as a physician.  During the relevant time period, Dr. Kreso worked in the emergency department (ED) at the Denver VA Medical Center.  In late April and early May 2009, complaints about the conduct of Dr. Kreso in the ED were brought to the attention of his superiors.  In May 2009, Lynette Roff, Medical Center Director, initiated an investigation of Dr. Kreso by an Administrative Investigation Board (AIB).  On November 13, 2009, Dr. Don Weinshenker, the associate chief of staff for ambulatory care and the second line supervisor for Dr. Kreso, gave Dr. Kreso a memorandum advising Dr. Kreso of his proposed discharge (Proposed Discharge Memorandum).  D1361 - D1365.  The memorandum detailed six different charges against Dr. Kreso.  Some charges included sub-categories referred to as specifications.

On November 17, 2009, Dr. Kreso asked the VA to provide him additional information before he responded to the charges.  D1153.  In his November 20, 2009, response, Dr. Weinshenker provided additional information and stated that Dr. Kreso had received all documents "considered by the AIB and me in proposing the removal action.  No other records were considered."  D1291.  On November 27, 2009, Dr. Kreso submitted his response.  D1208 - D1289.  On December 10, 2009, the AIB gave Dr. Kreso a separate response to some of his requests for additional information.  Dr. Kreso submitted a supplemental reply, D1182 - D 1185, and he attended an oral reply meeting on February 1, 2010.  D1169. In a memorandum dated March 11, 2010, Ms. Roff, the Medical Center Director, informed Dr. Kreso that she had discharged him from

---

[3] . I refer to pages in the administrative record by the page numbers assigned in the administrative record, e.g., D0101.

employment.  D1110 - D1111.  Ms. Roff sustained charges 1, 2, 3, and 6 as stated in the Proposed Discharge Memorandum.  D1361 - D 1365.  Charges 4 and 5 were not sustained.

Dr. Kreso appealed to the VA Under Secretary for Health and requested a hearing before a Disciplinary Appeals Board (DAB).  D2165 - D2353.  The DAB held a three day hearing in October 2010.  Following the hearing, the DAB issued a Board Action which included findings on each charge.  D2127 - D2152.  Charge 1 was sustained in part, charge 2 was not sustained, charge 3 was sustained in part, and charge 6 was sustained in whole.  D2127.  The DAB affirmed the penalty of discharge.  D2127.  On March 17, 2011, the Principal Deputy Under Secretary for Health affirmed the decision of the DAB.  D2152.

The charges and specifications sustained by the DAB included:

**Charge 1** - Failure to attend to patients presenting to the ED for treatment.

- Specification 1 - Concerned patient WB presenting in the ED on May 11, 2009, with urinary problems.

- Specification 2 - Concerned patient DW from Salt Lake City presenting to the ED on May 10, 2009, for completion of his lodging request while in need of oxygen.

- Specification 5 - Concerned patient IS presenting to the ED on April 29, 2009, with a complaint of inability to sleep due to coughing, congestion, and sore throat.

**Charge 3** - Patient Neglect - Delay of care to patients

- Specification 1 - Concerned patient GS, a quadriplegic, presenting to the ED on May 7, 2009, with fever, change in breathing, thick sputum, and

difficulty suctioning his tracheostomy.  Dr. Kreso was charged with

downgrading this patient's Triage Level from a 3 to a 4, resulting in a long

delay in the treatment of the patient.

**Charge 6** - Disruptive behavior - On May 22, 2009, Dr. Kreso verbally confronted

Judy Cooley, a hospital employee, on two separate occasions concerning

scheduling issues.

All other charges and specifications were not sustained during the process which

culminated in the decision of the DAB and the affirmance of that decision by the

Principal Deputy Under Secretary for Health.

On September 9, 2011, Dr. Kreso filed his complaint in this court seeking judicial

review of the decision by the VA to terminate his employment.  The sustained charges

and specifications summarized above are the subject of the challenges presented by

Dr. Kreso.  Dr. Kreso contends the DAB acted improperly when it upheld his termination

based on the charges summarized above.

### IV.  SUFFICIENCY OF THE EVIDENCE

#### A.  Charge 1 - Failure to attend to patients
#### presenting to the ED for treatment

**Specification 1** - The DAB summarized the facts of Charge 1, Specification 1 as

follows: Patient WB presented to the ED at 5:23 a.m. on May 11, 2009, complaining of

dysuria and difficulty with flow in his catheter.  WB has a history of bladder cancer.

Registered nurse (RN) Floris McNeal manipulated the catheter and resolved the issue.

At 6:10 a.m., registered nurse Susan West informed Dr. Kreso of the presence of the

patient and the treatment provided by Ms. McNeal.  Before reviewing the medical record

of the patient, Dr. Kreso instructed Ms. West to send the patient home.  A short time

later, Dr Kreso reviewed the record in the computer and entered a computer note.  He did not examine or interact with the patient.  Reviewing the medical record had no part in the decision to send the patient home.  D2132.  Shortly after he arrived at the ED, this patient was triaged at level 3.  D1401.

The DAB found this series of events to be a violation of ED policy and instructions given to Dr. Kreso by his superiors.  Because Dr. Kreso did not examine WB, the board concluded, WB did not receive an examination by a qualified medical practitioner.  The DAB concluded that the ED is obligated under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, to provide such an examination to every patient.[4]  Dr. Kreso said he was aware of this policy and ED supervisors, Dr. Baker and  Dr. Weinshenker, testified that they had informed Dr. Kreso of this policy.  D2133.

Dr. Kreso is critical of the conclusions of the DAB on this specification for several reasons.  First, he notes that witnesses testified at the hearing that repositioning, deflating, and re-inflating a Foley catheter is well within the scope of nursing practice in Colorado.  The unstated implication of this argument is that, applying the scope of nursing practice in Colorado, Dr. Kreso was not required to see patient WB.  However, the record is replete with evidence that the policies in effect at the Denver VA Medical Center required Dr. Kreso to see this patient.  The DAB considered the policies in effect at the time and the discussions the supervisors of Dr. Kreso had with Dr. Kreso concerning the requirement that he adhere to these policies.  D2133.  There is no dispute that the hospital policies in effect at the time of this incident required Dr. Kreso

---

[4] Although not binding on the VA, the Denver VA Medical Center follows the requirements of the EMTALA.  *Brief* [#31], p. 6.

to see a patient who had been triaged at level 3.

Second, Dr. Kreso contends that the DAB ignored testimony by Dr. Meyer explaining that the VA was making greater efforts to get non-emergency patients out of the ED and treat them instead at clinic appointments.  Further, he contends the DAB ignored a series of e-mails written by Dr. Weinshenker indicating that certain level triage patients were not to be seen in the ED.  As viewed by the DAB, the underlying premise of this evidence and argument was that "WB would be a level 5 triage patient" and level 5 patients need not be seen by an MD.  D2133.  The documentation in the record shows patient EB was triaged at level 3.  D1401.  The DAB considered the e-mails, but determined that the e-mails were not persuasive evidence that Dr. Kreso complied with applicable policies.  D2132 - D2133.  Rather, the DAB found, based reasonably on evidence in the record, that Dr. Kreso had been told and was aware that all patients must be seen by a qualified medical practitioner. D2133.

Third, Dr. Kreso notes the lack of written policies on this topic.  The evidence supports his contention that there were few, if any, apposite written polices.  However, the DAB had ample evidence to support the conclusion that Dr. Kreso had been told repeatedly by his supervisors about the relevant ED policies requiring examination by a physician.  Lack of written policies does not undermine the well supported conclusion that Dr. Kreso had been told about the applicable ED policies and was aware of those polices.

Fourth, Dr. Kreso asserts that the "DAB lacked any evidence to support this charge based on the uncontroverted testimony of Dr. Kreso that since this patient was a level 5 triage patient, that he did not need to be seen by a doctor." *Brief* [#28], p. 12.  In the view of Dr. Kreso, this is confirmed by the fact that Ms. West triaged the patient and

did not ask Dr. Kreso to see the patient.  *Id.*  To rehearse, patient WB was triaged at

level 3.  D1401.  The claim that the patient was triaged at level 5 is not consistent with

the evidence in the record.  Here and elsewhere, Dr. Kreso often disagreed with the

triage level assigned to patients by nursing staff.  That disagreement, however, does not

change the record before the DAB.

The decision of the DAB to sustain Charge 1, Specification 1 is based on

relevant evidence which a reasonable mind might accept as adequate to support, by a

preponderance of the evidence, the conclusions of the DAB on Charge 1, Specification

1.  The DAB considered contrary evidence, and the evidence, considered as a whole,

provided substantial support for the conclusions of the DAB.

**Specification 2** - The DAB summarized the facts of Charge 1, Specification 2 as

follows: On May 10, 2009, patient DW from Salt Lake City presented in the ED for

completion of his lodging request.  DW had an appointment the following day and

sought overnight lodging for the night prior to his appointment.  Initially, Dr. Kreso

refused to complete the lodging request or to prescribe oxygen for this patient.

Previously, Dr. Kreso had been counseled by his supervisor, Dr. Sandra Baker, M.D., to

evaluate and treat lodging patients who present in the ED.  D2134.

Initially, Dr. Kreso was told of the presence of DW by a hospital employee, the

administrative officer on duty (AOD).  Dr. Kreso told the AOD to send the patient home.

Dr. Kreso refused to provide oxygen to DW, whose oxygen supply was low or

exhausted.  Dr. Kreso said he was afraid of being reprimanded by nursing staff for

providing ED oxygen to DW.  Dr. Kreso told the AOD to give DW the telephone number

for an oxygen supply company.  DW then went to the lobby to use the public phone.

D2134.

In the lobby, Nurse Fox observed that DW was having trouble using the phone. Nurse Fox testified that DW did not have any oxygen and he "was gasping like he was trying to get air." D2205 - D2006. A VA police officer, Officer Weston, then began to assist DW. Officer Weston observed that DW could not breathe and that his oxygen supply was exhausted. D1541. While Nurse Fox continued to assist DW, Officer Weston went to the ED to seek assistance for DW. Officer Weston spoke to Dr. Kreso in the ED and told him a man who came from Salt Lake City was in the lobby and can't breathe. D1542. Dr. Kreso said "I know, he was just here. He wants lodging." Officer Weston said "he can't breath(e). Somebody needs to get him oxygen. I said he's about ready to fall out out there." D1542. Dr. Kreso responded by saying "well, we're not giving him oxygen." D1542. Officer Weston asked "what are we going to do, just let him fall out?" Dr. Kreso responded "when this happens we'll deal with it." D1542. Officer Weston described the same circumstances in his testimony to the DAB. D0204 - D0212. Officer Weston continued to insist that DW needed oxygen and approached the AOD insisting that DW needed oxygen. D0212. The AOD said he had orders from the doctor saying "no." D0212. A short time later, Officer Weston saw DW in the ED waiting room with oxygen. D0212. Officer Weston estimated DW was without oxygen for about 30 minutes. D0214.

A second police officer, Officer DeDiemar, also testified that he was present when DW was in the lobby before Officer Weston went to the emergency room to insist that DW be given oxygen. D0607 - D0609. Officer DeDiemar said DW did not appear to be in distress from lack of oxygen while he was in the lobby. Officer DeDiemar did not see DW in the emergency department after DW was moved from the lobby to the emergency department. D0616.

The DAB found that DW arrived at the ED without the proper paperwork for his lodging request and without the proper medical supplies he should have brought with him.  D2136.  Even so, the DAB concluded that Dr. Kreso "showed a severe lack of compassion and lack of concern for DW's medical well()being" when he directed that the patient be sent to the phone to obtain a sufficient oxygen supply to return to Salt Lake City and to miss his VA appointments the following day.  D2136.  "Dr. Kreso disregarded the concerns of Officer Weston in regards to the medical distress of DW and simply walked away.  This behavior falls well below the expected standard of care of any doctor, and placed DW at significant risk.  In his testimony before the AIB and DAB he remained ambivalent over whether he should have cared for DW."   D2136.

Dr. Kreso is critical of the conclusions of the DAB on this specification because he says the record does not contain substantial evidence to support this charge. According to Dr. Kreso, DW did not present to the emergency room for treatment when he first arrived.  Rather, he presented with a request for lodging.  Dr. Kreso says he told DW that DW would need to arrange for a sufficient supply of supplemental oxygen in order to be lodged and, at this time, DW was not short of breath and was in no acute distress. D0702 - D0707.  Dr. Kreso also testified that he could see DW and DW was not in distress when Officer Weston approached Dr. Kreso seeking help for DW.  D0707 - D0709.

Dr. Kreso argues that the "DAB's reliance on the lay testimony of one of the two police officers does not provide substantial evidence for sustaining this charge." *Brief* [#28], p. 13.  He notes that his own testimony is contrary to that of Officer Weston concerning the level of distress suffered by DW.  In addition, he notes that the testimony of Officer DeDiemar is contrary to that of Officer Weston concerning the level of distress

suffered by DW when Officers Weston and DeDiemar and Nurse Fox were attending to

DW before DW returned to the ED.  Dr. Sabharwal, a member of the DAB, issued a

minority opinion in which he disagreed with certain findings of the DAB as to

Specification 2.  D2150.  Addressing Specification 2, Dr. Sabharwal concluded "(t)here

was not sufficient evidence that the patient was in respiratory distress requiring medical

services of a provider . . . ."  D2150.

The differences between the testimony of Nurse Fox and Officer Weston on one

hand and Officer DeDiemar and Dr. Kreso on the other hand are significant.  To arrive

at a conclusion about the facts, the DAB had to determine which witnesses were most

credible and reliable on the key facts.  The DAB considered the conflicting testimony.

D2135 - D2136.  A majority of the DAB concluded that Nurse Fox and Officer Weston

were more credible and reliable on the key facts than were Officer DeDiemar and Dr.

Kreso.  Nothing in the record shows that this credibility determination was arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law.  The

testimony of Nurse Fox and Officer Weston provides relevant evidence which a

reasonable mind might accept as adequate to support, by a preponderance of the

evidence, the conclusions of the DAB on Charge 1, Specification 2.  The DAB

considered contrary evidence and the evidence, considered as a whole, provided

substantial support for the conclusions of the DAB.

**Specification 5** - The DAB summarized the facts of Charge 1, Specification 5 as

follows:  On April 29, 2009, IS presented to the ED at 3:17 a.m., complaining of inability

to sleep due to coughing, congestion, and sore throat.  The patient had been

symptomatic for a few days and came to the ED because his wife was concerned that

his condition was not improving.  In addition, she was worried about possible cardiac

Case 1:11-cv-02378-REB   Document 40   Filed 09/09/14   USDC Colorado   Page 13 of 29

symptoms.  D2138.  Dr. Kreso examined the patient and discharged him with a diagnosis of "likely chronic sinusitis with post nasal drip in the setting of obesity/weight gain."  D2138 - D2139.  Dr. Kreso informed IS that Dr. Kreso considered IS to have visited the ED inappropriately.  The patient felt Dr. Kreso's examination was brief and cursory, and he was upset by his interaction with Dr. Kruso.  The patient filed a complaint with the patient advocate the next day.

The DAB found that the presentation of IS in the ED was legitimate based on his concern that his condition was not improving.  D2139.  Addressing the contention of IS that he complained of chest pains, versus the testimony of Dr. Kreso that IS did not complain of chest pains, the DAB found "(i)t is probable that IS did not emphasize chest pains to the triage nurse."  D2139.  Noting a dispute about the extent of the physical examination performed by Dr. Kreso, the DAB noted the testimony of IS that Dr. Kreso did not examine his chest, just his upper back.  D2139.  Dr. Kreso testified that he performed an ENT exam, a cardiovascular exam, a pulmonary exam, and listened to all four lobes of IS's lungs.  D0735.  Addressing this dispute about Dr. Kreso's examination, the DAB said "Dr. Kreso's opinion at the time, as revealed by his documentation, gives grounds for concern over its thoroughness."  D2139.  Although the DAB found some errors in the memory of IS about certain details, "the Board found the majority of IS's story credible."  D2139.  Dr. Sabharwal, a member of the DAB, issued a minority opinion in which he disagreed with the findings of the DAB on Specification 5.  D2150 - D2151.

The differences between the testimony of Dr. Kreso and IS are significant.  To arrive at a conclusion about the facts, the DAB had to determine which witness was most credible and reliable on the key facts.  After considering the conflicting testimony,

a majority of the DAB concluded that the majority of IS's story is credible.  Nothing in the

record shows that this credibility determination was arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.  The testimony of IS provides

relevant evidence which a reasonable mind might accept as adequate to support, by a

preponderance of the evidence, the conclusions of the DAB on Charge 1, Specification

5.  The DAB considered contrary evidence, and the evidence, considered as a whole,

provided substantial support for the conclusions of the DAB.

### B.  Charge 3 - Patient neglect - delay of care to patients

**Specification 1** - The DAB summarized the facts of Charge 3, Specification 1 as

follows: On May 7, 2009, patient GS, a quadriplegic, presented to the ED with fever,

change in breathing, thick sputum, and difficulty suctioning his tracheostomy.  Dr. Kreso

changed the triage level assigned to GS from a 3 to a 4.  This change meant GS would

be seen by the nurse practitioner on duty and not by an M.D.  As a consequence of this

change in triage level, GS waited four hours before being seen by a nurse practitioner.

D2141.

The DAB concluded that there was no doubt that GS needed to visit the ED.  As

a quadriplegic with a tracheostomy and known recurrent urinary tract infections his

triage level should not have been downgraded.  A humane triage level would be a two,

and most physicians would consider that GS was placed at some risk due to the delay.

D2141.

Dr. Kreso disputes most of the key facts on which the DAB relied to sustain this

charge.  Dr. Kreso had treated GS, with whom he had a good rapport, on many prior

occasions.  D0744 (Dr. Kreso testimony).  Dr. Kreso testified that he did not recall

changing the triage level for GS on May 7, 2009.  D0743.  Dr. Kreso testified to the DAB

that, had he known this patient was GS, he would have increased his triage level because he was aware of the many health problems suffered by GS.  D0744.  Dr. Kreso says it "is highly suspect that Dr. Kreso was even the person who changed the triage level as the patient was not even triaged until the last hour of Dr.  Kreso's shift."  *Brief* [#28], p. 15.  In addition, he contends that the only testimony to support the finding of the DAB is the testimony of Nurse Back, who the DAB found to be "overly antagonistic" toward Dr. Kreso.  D2131.

The DAB noted the contention of Dr. Kreso that, because his shift was almost over when GS arrived, Dr. Kreso would not have changed the triage level of GS. However, the DAB found this testimony was "contradicted by credible testimony . . . ." D2141.  The DAB relied primarily on the testimony of Sylvia Murray, an RN who worked in the ED on May 7, 2009, and who initially assigned GS a triage level of 3.   D1515 - 1516, D1522.  Ms. Murray testified that Dr. Kreso changed the triage level of GS from a 3 to a 4, that she argued with Dr. Kreso about the change, and that he argued back. D1515 - 1516, D1522.  The DAB cited the testimony of Nurse Back as support for the finding that, as a result of the change in the triage level, GS waited four hours before being seen by a nurse practitioner.  D2141.  The record does not support the contention of Dr. Kreso that the "only testimony to support the Board's finding was that of Nurse Back . . . ."  *Brief* [#28], p. 15.

It must be noted also that the DAB found the testimony of Dr. Kreso to not always be credible.  "Dr. Kreso's testmony before the DAB was often at odds with his testimony before the AIB and with his representation of the facts in his two written presentations to the Director in response to the proposed removal."  D2131.  To find the facts, the DAB had to determine which witness was most credible.  The DAB considered the conflicting

testimony, most notably the conflicting testimony of Dr. Kreso and Ms. Murray, and

concluded that Ms. Murray was more credible on the key facts.  Nothing in the record

shows that this credibility determination was arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.

Dr. Kreso argues that the DAB relied unreasonably on the "clearly prejudiced"

and "bigoted unsolicited testimony at the AIB hearing."  *Reply* [#37], pp. 10 - 11.

Speaking about how some ED employees "hate to work with" Dr. Kreso, Ms. Murray

said:

> . . . they dread it (working with Dr. Kreso) kind of, you know.  Oh, God,
> here we go. You know, he's from a different country.  Maybe his belief
> system from that country is, you know, different than ours.  And I tried to
> work with that behavior, you know, because it's kind of overpowering
> sometimes, and I tried to just say that's because he's from, I don't
> remember, Bosnia or - - maybe that's why, you know, because his
> demeanor is a little different because he's from a different place.

D1519.  It is a stretch to read this statement by Ms. Murray as bigoted. I conclude that

such a reading is not reasonable.  This statement shows that Ms. Murray was honestly

seeking an explanation for the behavior of Dr. Kreso, rather than assuming Dr. Kreso is

difficult because he is of a certain – in this case unknown – national origin.  To her

credit, Ms. Murray did not succumb blindly to a negative stereotype based on national

origin. Moreover, by no means does her statement require the DAB to conclude that her

testimony about the key facts is not credible.

The testimony of Ms. Murray provides competent, relevant evidence which a

reasonable mind might accept as adequate to support, by a preponderance of the

evidence, the conclusions of the DAB on Charge 3, Specification 1.  The DAB

considered contrary evidence, but the evidence, considered as a whole, provided

substantial evidence to support the conclusions of the DAB.

16

### C.  Charge 6 - Disruptive behavior

The DAB summarized the facts of Charge 6 as follows:  On two occasions on May 22, 2009, Dr. Kreso verbally confronted Judy Cooley, the Lead Compensation and Pension Program (C&P) Support Assistant.  Dr. Kreso was detailed to C&P on May 20, 2009, while the AIB and its conclusions were being processed.  Ms. Cooley was in charge of scheduling for C&P.  On several occasions, Dr. Kreso requested that his schedule of patients be altered so his patients would be scheduled closer together. Ms. Cooley discussed the requests of Dr. Kreso with her supervisor, Dr. D'Arcy.    Ms. Cooley was instructed not to alter the schedule of Dr. Kreso.  In addition, she was told not to speak to Dr. Kreso about his scheduling without either Dr. D'Arcy or Dr. Weinshenker present.  D2143.  Dr. Kreso was aware of the requirement that he address either Dr. D'Arcy or Dr. Weinshenker with scheduling issues, but he twice confronted Ms. Cooley in an attempt to get her to change his schedule.

In the first incident, Dr. Kreso approached Ms. Cooley's while she was sitting at her desk.  She told Dr. Kreso she would not discuss scheduling with him.  Feeling uncomfortable, she stood up.  Dr. Kreso asked if she would not talk to him because they disagreed.  Ms. Cooley said no, and said she would not allow him to bully her.  D0240.

In the second incident, later the same day, Dr. Kreso approached Ms.Cooley "carrying his body in a fast, aggressive type of walk."  D0241. He confronted Ms. Cooley in a hallway and again asked to talk about the schedule, speaking in a raised voice.  He physically blocked her path down the hallway.  When she told Dr. Kreso that she could not help him, Dr. Kreso said "Yes you will," and he continued to tell her in a commanding voice what she needed to do.  He was speaking to Ms. Cooley in an aggressive manner and insisting that she help him even though she informed Dr. Kreso

that he needed to speak to Dr. D'Arcy or Dr. Weinshenker about scheduling.  Ms. Cooley said Dr. Kreso "was intentionally blocking my path."  D2143.  Every time I would step to the left he would step to the left."  D2143.  When Ms. Cooley got around Dr. Kreso, she went to her office.  Dr. Kreso followed her into her office, but left when Ms. Cooley picked up the phone, saying she was calling Dr. Weinshenker.  D0242 - D0243.

Dr. Franzoza witnessed the portion of this incident that took place in the hallway. She said Dr. Kreso was not so aggressive that Dr. Franzoza felt she had to intervene. D2144.  Dr. Fanzoza filed an incident report at the request of the supervisor of Dr. Kreso and Ms. Cooley.  Absent this request, Dr. Franzoza says she probably would not have written a report.  D2144.

Dr. Kreso contends the DAB sustained this charge without any evidence to support a finding of disruptive behavior.  He does not deny that the two incidents occurred, but he claims they were blown out of all proportion. *Brief* [#28], p. 16.  He notes that "Ms. Cooley did not say she was so upset she was afraid to go home after the incident. . . ." *Id.*  The DAB concluded that Ms. Cooley felt uncomfortable and threatened yet, Dr. Kreso notes, she did not ask Dr. Kreso to move during the second incident, and she did not tell Dr. Kreso that she was nervous.  *Id.*  Notably, Ms. Cooley testified that in the second encounter, when Dr. Kreso was blocking her path in the hallway and speaking to her in a raised and demanding voice, "I was intimidated . . . ." D0243.  "I didn't know what he was going to do with me, especially when he followed me into my office and I knew there was no way I could get out of there."  D0243.  "I was intimidated that he might try to hurt me at that time."  D0244.  Dr. Kreso acknowledged that he probably got into Ms. Cooley's personal space and that he caused Ms. Cooley to feel intimidated, even though he said that was not his intent.  D0757, D0865.

The testimony of Ms. Cooley provides competent, relevant evidence which a reasonable mind might accept as adequate to support, by a preponderance of the evidence, the conclusions of the DAB on Charge 6.  The DAB considered contrary evidence, and the evidence, considered as a whole, provided substantial evidence to support the conclusions of the DAB.  Notably, the testimony of Dr. Kreso and Dr. Franzoza, a percipient witness, is largely consistent with that of Ms. Cooley.  This testimony provided substantial evidence to support the conclusion of the DAB.

Dr. Sabharwal, a member of the DAB, issued a minority opinion in which he disagreed with the findings of the DAB on Charge 6.  D2151.  Dr. Sabharwal concluded that the behavior of Dr. Kreso, though inappropriate and confrontational, did not rise to the level of disruptive behavior.  D2151.  The position of Dr. Sabharwal on this issue is reasonable, but the fact that Dr. Sabharwal took this position, without more, does not demonstrate that the position taken by the other two members of the DAB was not supported by substantial evidence or was otherwise arbitrary, capricious, an abuse of discretion, or not in accordance with law.

## V.  IMPROPER PENALTY

Dr. Kreso contends the penalty imposed on him was arbitrary and capricious and not in accord with VA policy.  He argues that the DAB did not consider the relevant factors and strike a reasonable balance within tolerable limits, as required by VA regulations.  To establish this claim, Dr. Kreso must show the absence of a rational connection between the findings of fact of the DAB and the termination decision. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994).  In essence, I must determine whether the decision to impose termination was a rational decision based on the facts found by the DAB and was a decision which complied with

applicable law and regulations.

Dr. Kreso cites the so-called *Douglas* factors as the relevant standards of analysis. *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280 (1981). The *Douglas* factors are not part of the regulations and directives which control DAB proceedings. D0991 - D1015. However, because Ms. Roff, who made the initial termination decision, used the *Douglas* factors, the DAB reviewed that analysis. The *Douglas* factors include:

1) the nature and seriousness of the offense, and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public and prominence of the position;

3) the employee's past disciplinary record;

4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon the supervisor's confidence in the employee's ability to perform assigned duties;

6) consistency of the penalty with those imposed upon other employees for the same or similar offenses;

7) consistency of the penalty with any applicable agency table of penalties;

8) the notoriety of the offense or its impact upon the reputation of the agency;

9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in

question;

10) potential for the employee's rehabilitation;

11) mitigating circumstances surrounding the offense such as unusual job tension, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and

12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

***Douglas v. Veterans Admin.***, 5 M.S.P.R. 280, 306 (1981).

Dr. Kreso contends certain mitigating aspects listed in the ***Douglas*** factors were not considered. These include no prior disciplinary action, no actual harm to patients or harm to the reputation or public image of the VA, lack of documented progressive discipline or counseling, no evidence of intentional wrongdoing, excessive duty hours (70 per week) contributing to job related stress, no defined emergency room triage policy, and lack of clarity of instructions and supervision.

The DAB reviewed all of the ***Douglas*** factors with Ms. Roff. D0514 - D0519. That review included the mitigating factors. The DAB cited reasons provided in VHA Handbook 5021, Part II, Chapter I, 7(2) which may warrant considering a more severe disciplinary action. Those reasons are "(a) the facts of the case, (b) the degree of willfulness of the employee's violation of VA conduct rules, (c) the seriousness of the misconduct or deficiency incompetence [*sic*], and (d) the resultant impact on VA operations." D2147. Ultimately, the Board reached the following conclusion:

> The board agrees that the agency should expect an employee to be compliant with its procedures, and to follow the direction of supervisors to support the high quality of care provided to its patients. The Appellant

demonstrated a pattern of behavior exemplifying disregard for established written or verbal procedures which, though they were not always presented in writing, he had testified that he was very familiar with them. The appellant lacked recognition of the seriousness of his actions and demonstrated a lack of sensitivity to the need for ED procedures.

\*   \*   \*   \*

The Agency's action of Removal (Discharge) is sustained based on the preponderance of the evidence. The Board concludes that the Deciding Official's (Director: Ms. Roff), in light of the sustained charges and her analysis of the Douglas Factors, decision to impose the penalty of discharge is appropriate and within the range of reasonableness.

D2147. Board member Dr. Sabharwal dissented on the on the issue of penalty. Dr. Sabharwal opined: "Even though I believe that the option of discharge was open to the Director, I disagree with the penalty of discharge by the Director." D2149.

Obviously, there is room for disagreement on the question of whether discharge was the appropriate penalty. The non-mandatory *Douglas* factors pull in both directions, but, notably, several of the important factors weigh in favor of termination. Dr. Kreso understood the directions given to him by his supervisor, but repeatedly disregarded those directions. Dr. Kreso exhibited a "pattern of behavior exemplifying disregard for established written or verbal procedures which" procedures he understood. His behavior had a significant adverse effect or potential effect on the care provided to VA patients. Despite repeated instruction from his supervisors, he continued this objectionable pattern of behavior in the incidents examined by the DAB. Reasonably, a decision maker could view these factors as outweighing the other, mitigating factors. Applying the four factors from the VHA Handbook 5021, it is reasonable to conclude that Dr. Kreso engaged in willful, serious misconduct which had a significant impact on VA operations. Thus, there is a rational connection between the facts found by the DAB and the decision to terminate Dr. Kreso. Accordingly, the

imposition of this penalty was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## VI.  COMPLIANCE WITH REQUIRED PROCEDURES

Dr. Kreso argues also that the procedures leading to his discharge and the decision of the DAB were not in accord with the requirements of the Due Process Clause and applicable VA procedures.

## A.  AIB Investigation & Initial Termination Decision

Dr. Kreso claims that he was not informed of the specific charges against him before he testified during the AIB investigation – the first level of investigation in the termination procedure.  Dr. Kreso contends that he was told only that the purpose of the AIB investigation was to look at acts of omission or commission in his care.  He says he was not given his notes of the care he provided before or during his testimony before the AIB, in spite of his request for those records or at least the names of the patients.

As the VA notes, the full panoply of procedural due process rights does not attach in non-adjudicative, governmental actions, such as an investigation conducted by an administrative investigation board.  *See Hannah v. Larche*, 363 U.S. 420, 442-43 (1960).  Thus, the applicable regulations do not create due process rights related to an AIB investigation.

## B.  Proposed Discharge Memorandum & DAB Hearing

Once the investigation was complete, Dr. Kreso received the Proposed Discharge Memorandum.  D1361 - D1365.  There, the charges and specifications were detailed.  At that point, under the applicable VA policies, Dr. Kreso had the right to the following:

• A written notice of the proposed removal (provided 30 days in advance),

describing the nature of the action proposed; the specific charges; the law, regulation, policy or practice that was violated; and a statement of any past disciplinary record to be relied upon as evidence;

• The right to reply, both orally and in writing, and to submit affidavits and other documentary evidence;

• The right to a reasonable amount of time to reply;

• The right to review the material supporting the proposed action;

• Identification of the official who will receive the reply;

• Identification of the decision official;

• The right to an attorney;

• The right to a written decision; and

• The right to appeal the discharge.

*VA Directive 5021/3, Appendix A*, § 6.c.; D1009 - D1011.

Dr. Kreso asserts that the Proposed Discharge Memorandum did not include all of the evidence on which the proposed action was based.  In response to his request for additional evidence, some requests were granted; some were denied.  D1153 (request); D1291 - D1292; D1359 (responses).  In his initial response, he noted his contention that he had not been given all of the evidence considered by the AIB.  D1208 - D1217.  He was permitted to supplement his reply to the proposed discharge after he received additional information.  D1182 - D1185. The DAB addressed the issues raised by Dr. Kreso concerning the information he sought.  D0990; D2129 - D2130.  In essence, the DAB found that Dr. Kreso had been provided all of the information to which he was entitled. D0990; D2129 - D2130.  Nothing in the record indicates that this finding was arbitrary, capricious, or an abuse of discretion.

Dr. Kreso notes that Dr. Michael Blieden reviewed a number of cases and

documents with the AIB, but those documents were not included in the documents provided to Dr. Kreso.   *Brief* [#28], p. 19.   However, Dr. Kreso was not entitled to these documents.   None of the patients Dr. Blieden discussed with the AIB was the subject of any of the charges brought against Dr. Kreso in the Proposed Discharge Memorandum. Moreover, this information was not material supporting the proposed action.

Dr. Kreso contends also that his inability to know the names of the patients in question during the AIB investigation was a breach of his fundamental right to due process.   On some points, his testimony before the AIB differed from his testimony before the DAB because he did not have this information when testifying to the AIB, but did have this information when testifying to the DAB.   The DAB noted some inconsistencies in the testimony of Dr. Kreso, which, to some extent, affected the credibility of Dr. Kreso.   D2131.   However, Dr. Kreso had the opportunity to explain to the DAB his inability to review the patient records before testifying to the AIB.   D0694 (Dr. Kreso DAB testimony noting lack of access to these records).   The only specific patient mentioned by Dr. Kreso in relation to this issue is GS, the quadriplegic patient. *Brief* [#28], p. 20 - 21.   Relevantly, the findings of the DAB concerning GS do not focus on discrepancies in the testimony of Dr. Kreso concerning GS.   Rather, the DAB found the testimony of Ms. Murray to be credible on the key facts in dispute.   D2141.

The DAB refused to permit Dr. Kreso to call an expert witness to testify that the treatment of the patients at issue in the charges met the standard of care.   Dr. Kreso contends this is a violation of applicable regulations and due process.   The DAB denied this request, concluding: "The Disciplinary Appeals Board is a peer review process. The members of the Disciplinary Appeals Board convened to hear the appeal filed by Dr. Kreso are his peers, as well as subject matter experts. Your request for a subject matter

expert is therefore denied as the members of this Board have sufficient professional knowledge to evaluate the specific issues of clinical competence and/or direct patient care involved in the appeal." D0990   The DAB had the authority to make this determination.  *VA Handbook 5021/1, Part V, Chapter 1*, § 6.b.; D0993. In these circumstances, the exclusion of the proposed expert testimony is not a violation of the Due Process Clause or applicable regulations.

According to Dr. Kreso, the VA violated his right to due process when the VA prevented him from cross-examining certain witnesses.  However, a party in an administrative discharge hearing does not have an absolute right to cross-examine witnesses. ***McClure v. Indep. Sch. Dist. No. 16***, 228 F.3d 1205, 1211-12 (10th Cir. 2000).  "(W)hether the Due Process Clause requires that the terminated employee be offered the right to cross-examine or confront witnesses depends upon the significance and nature of the factual disputes at issue." ***West v. Grand Cnty.***, 967 F.2d 362, 369 (10th Cir. 1992).

Dr. Kreso says he was denied the right to effectively confront and cross-examine Dr. J. Brian Hancock because the report of Dr. Hancock was not disclosed to him before the DAB hearing.  Dr. Hancock issued a written opinion in February 2010, in which he recommended that all charges against Dr. Kreso be sustained.  D1041 - D1043.  Dr. Kreso makes no showing that cross examination of Dr. Hancock would have permitted him to present a stronger case to the DAB.  Dr. Hancock recommended that all of the charges against Dr. Kreso be sustained.  In contrast, the DAB did not sustain all charges.  Most relevantly, the DAB does not cite the report of Dr. Hancock in its final decision.   D2127 - D2152.

Dr. Kreso argues also that the DAB relied on the testimony of several witnesses

26

he was not permitted to cross-examine.  These witnesses include Partricial Lyman, Sylvia Murray, Karla Perkins, Kim Ator, Dr. Michael Blieden, Francis Keffler, Mark Phillips, Carlos Montoya, and Ann Jordway.  *Brief* [#28], p. 23.  Dr. Blieden testified at the DAB hearing, and counsel for Dr. Kreso cross-examined him.  D0472 - D0477.

The VA listed Sylvia Murray on its final witness list.  D0962.  Dr. Kreso objected, D0920, and Ms. Murray was removed from the final witness list.  D0915.  Thus, Dr. Kreso cannot complain about his inability to cross-examine Ms. Murray when he sought, successfully, to exclude her testimony from the DAB hearing.  ***West v. Grand Cnty***., 967 F.2d 362, 369 (10th Cir. 1992).

Dr. Francis Keffler is shown on both the final witness list of the VA, D0915, and the later final witness list approved for the hearing.  D0915.  For reasons unstated, Dr. Keffler did not testify at the DAB hearing.  However, there is no indication that Dr. Kreso made any effort to obtain the testimony of Dr. Keffler or that he was inhibited or restricted from doing so.

Karla Perkins is shown on the final witness list of the VA, D0915, but not on the later final witness list approved for the hearing.  D0915.  The other witnesses listed by Dr. Kreso in his brief do not appear on either witness list.   As to these witnesses, there is no indication that Dr. Kreso made any effort to obtain their testimony at the DAB hearing or that he was inhibited or restricted from doing so.  In these circumstances, he cannot contend that his inability to cross-examine these witnesses violated his right to due process or his rights under the applicable regulations.  ***West***, 967 F.2d at 369.

Prior to the DAB hearing, certain VA personnel sent a string of e-mails to the members of the DAB.  In these e-mails, the authors express some concern that Dr. Kreso might be violent at the DAB hearing.  These e-mails were addressed by the DAB

at the beginning of the hearing.  The DAB concluded that the e-mails were improper, that the VA had acted in good faith to correct the matter, and, most important, that the board had "not been tainted against [Dr. Kreso] as a result of the inappropriate comments in the e-mails."  D2130.  There is no basis to conclude that the e-mails demonstrate a violation of the right of due process of Dr. Kreso because there is no basis to conclude that the e-mails caused the DAB to be biased against Dr. Kreso. Notably, Dr. Kreso did not request that the DAB members recuse themselves.  Instead, he filed a motion for censure before the DAB.  D2130.

## VII. WHISTLE BLOWER CLAIM

Dr. Kreso implies that the decision to discharge him was motivated improperly by certain whistle blowing activity he undertook in April 2009. *Brief* [#28], p. 3.  However, whistle blowing was never mentioned in the DAB hearing.  Under 5 U.S.C. § 1214, such claims must be exhausted through administrative proceedings.  To the extent Dr. Kreso may seek to assert a whistle blowing claim here, that claim must be dismissed because it has not been exhausted administratively.

## VIII.  CONCLUSION & ORDERS

The members of DAB found this case to be both difficult and close.  Ultimately, the DAB made proper, factual determinations supported by substantial, preponderant evidence and, based on those determinations, imposed the penalty of discharge. Applying the deferential standard of 38 U.S.C. § 7462, those decisions of the DAB must be upheld.

**THEREFORE, IT IS ORDERED** as follows:

1.  That under 38 U.S.C. § 7462, the final decision of the Disciplinary Appeals Board, as approved by the Principal Deputy Under Secretary for Health, D2127 -

D2152, is **AFFIRMED**;

    2.  That **JUDGMENT SHALL ENTER** in favor of the defendants on all claims for relief asserted in the complaint [#1];

    3.  That the defendants are **AWARDED** their costs to be taxed by the clerk of the court in the time and manner required by Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1; and

    4.  That this case is **CLOSED**.

Dated September 9, 2014, at Denver, Colorado.

                                  **BY THE COURT:**

                                  Robert E. Blackburn
                                  United States District Judge